[No. A130654. First Dist., Div. One. June 8, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHANNES MEHSERLE, Defendant and Appellant.

## COUNSEL

Rains Lucia Stern, Michael L. Rains and Dylan Schaffer for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Laurence K. Sullivan and Amy Haddix, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MARCHIANO, P. J.**—Defendant Johannes Mehserle served as a police officer for the Bay Area Rapid Transit District (BART). Shortly after 2:00 a.m. on January 1, 2009, while responding to a report of a fight on a BART train, he shot and killed BART passenger Oscar Grant during a tense confrontation. Defendant was attempting to arrest and handcuff Grant for misdemeanor obstructing a police officer (Pen. Code, § 148), while Grant was lying facedown on the BART platform. Defendant shot Grant, who was unarmed, in the back. Defendant contended he meant to pull his Taser and shock Grant to subdue him, but accidentally drew his handgun by mistake and fired the fatal shot.

After a trial involving many witnesses, the jury found defendant not guilty of murder or voluntary manslaughter. The jury convicted defendant of involuntary manslaughter (Pen. Code, § 192, subd. (b)), thus necessarily finding the shooting was not accidental, but criminally negligent. The trial court sentenced him to two years in prison. Defendant raises several contentions on appeal, including the evidence was insufficient regarding criminal negligence to support an involuntary manslaughter conviction, the jury was improperly instructed, the trial court erred by not granting a new trial due to

newly discovered evidence, and the trial court erred by denying probation. We disagree with defendant's contentions and affirm the judgment of conviction. We first examine the facts in detail and then review the issues.

## I. FACTS

The People charged defendant with the murder of Oscar Grant (Pen. Code, § 187, subd. (a)).[1] They also alleged three firearm enhancements: personally and intentionally discharging a firearm causing great bodily injury and death (§§ 12022.7, subd. (a), 12022.53, subd. (d)); personally and intentionally discharging a firearm (§ 12022.53, subd. (c)); and personally using a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)).

Under applicable standards of appellate review, we must view the facts in the light most favorable to the judgment of conviction, and presume in support of the judgment the existence of every fact which the jury could reasonably find from the evidence. (*People v. Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110]; *People v. Neufer* (1994) 30 Cal.App.4th 244, 247 [35 Cal.Rptr.2d 386].)

### A. *Defendant's Weapons*

A proper understanding of the events surrounding the shooting requires at the outset a description of the weapons defendant was carrying that night and how they were holstered.

Defendant carried two weapons: a black model 226 40-caliber Sig Sauer handgun and a bright yellow Taser International X26 Taser. The handgun weighed more than three times as much as the Taser. The handgun had no manual safety switch, while the Taser had a safety switch that also functioned as an on/off switch. The Taser had a red laser sight; the handgun did not.

Defendant's handgun was holstered on his right side, called the dominant side—presumably because defendant is right-handed. The Taser was holstered on defendant's left, or nondominant, side, in a cross-draw configuration for use with the dominant (right) hand. The handgun holster had an automatic locking system, requiring a two-step process to remove the weapon: first, a rotating hood must be pressed down and rotated forward; second, a safety latch must be pushed back to release the weapon from its holster. The Taser holster had a safety strap and a safety hood.

---

[1] Subsequent statutory references are to the Penal Code unless otherwise indicated.

## B. *The Shooting on the BART Platform*

The facts of the shooting are taken not only from witness testimony, but a BART platform surveillance video and cell phone videos taken by five BART passengers. All of the videos were admitted into evidence.

In the small hours of the early morning of New Year's Day 2009, Grant boarded a BART train in San Francisco with his fiancée, Sophina Mesa, and several other friends. The group was bound for the Fruitvale BART station. The train was very crowded with New Year's Eve celebrants, and people were standing in the aisles.

As the train approached the Fruitvale BART station in Oakland, Grant began to argue with a fellow passenger and the two men started "tussling around." They attempted to strike each other, but the train was so crowded they were reduced to pushing and shoving. The aggression spread into a large fistfight, involving at least 10 men.

Passengers used the train intercom to report the fight to the operator, who in turn contacted BART central control. Central control apparently contacted BART police, whose dispatcher contacted officers in the field with a report of a fight at the Fruitvale BART station in the train's "lead car, no weapons, all black clothing, large group of B[lack] M[ales]."

The train reached the Fruitvale station and stopped at the platform. The train doors opened. The fight stopped. BART Police Officers Anthony Pirone and Marysol Domenici were on the street level of the station.[2] Pirone went up to the platform and saw five African-American men, including Grant and Michael Greer, and one woman standing on the platform by the lead car and talking. As Pirone approached, Grant and Greer got back on the train. According to a bystander, Pirone appeared to be agitated and said, "This train isn't fucking going anywhere, I'm not stupid, I see you guys."

Pirone ordered the three men who remained on the platform, who apparently were Jackie Bryson, Nigel Bryson and Carlos Reyes, to stand against the platform wall and keep their hands visible. He pulled his Taser and pointed it at the men as he ordered them to the wall. Pirone called Domenici and told her to come up to the platform, where he instructed her to watch the detained men against the wall.

---

[2] The surveillance videotape shows that the Fruitvale station consists of an open-air train platform above street level and a large area below where passengers purchase tickets and enter fare gates, taking stairs or escalators up to the platform. There is a wall on the side of the platform opposite, and parallel to, the train tracks.

Pirone ordered Grant off the train. By one account he said, "Get off the fucking train, otherwise I'm going to pull you out." By another account he said, "Get off the train motherfuckers." By his own account, Pirone said, "Get the fuck off the train." Grant got off the train. Pirone took Grant over to the three detainees and shoved him against the wall. The men sat down after being ordered to do so by Domenici.

Pirone went back to the train for Greer and ordered him out, saying "Get the fuck off my train." Pirone denied using profanity when he ordered Greer off the train, because of the presence of female passengers. Greer did not comply. Pirone said, "I've asked you politely. I'm going to have to remove you in front of all these people now." Pirone grabbed Greer by his hair and the scruff of his neck and forced him off the train. Train passengers described Pirone as hostile, angry, mean, and aggressive. One passenger said Pirone acted "like a punk." Defendant concedes Pirone was "verbally and physically abusive in his attempt to remove both Greer and Grant from the train."

According to Pirone, Greer struggled to break free once the two were on the platform. Pirone, therefore, pushed Greer and knocked him off balance. Pirone said Greer spun around and raised his fists, so Pirone used a takedown maneuver and swept Greer's legs out from under him, knocking him to the ground. Pirone handcuffed Greer. Several passengers testified that in their opinion Pirone used excessive or unnecessary force, or that his behavior was excessive.

Grant, Jackie Bryson, and Reyes jumped to their feet and shouted, "This is fucked up, this is fucked up." Domenici told them to "stay out of it." The three continued to yell at Pirone to stop what he was doing. Pirone approached Reyes and told him to "shut the fuck up." A cell phone video taken by a passenger shows Pirone striking Grant with his fist. There was testimony that Pirone shoved Grant against the wall. Pirone forced Grant to his knees. A passenger's video shows Pirone drawing his Taser and pointing it at the detainees. Grant pleaded with Pirone not to "Tase" him because "I have a daughter." Domenici drew her Taser and pointed it at the seated detainees, who kept their hands up and kept saying "don't tase me."

According to a BART surveillance video, defendant and his partner, Officer Woffinden, arrived on the platform at 2:08:27 a.m. Defendant ordered the men who were approaching Domenici to "get back." Defendant drew his Taser and pointed it at the detainees, including Grant. The Taser's red laser sight was trained on Grant's chest and groin. Woffinden drew his baton and ordered four or five people away from the detention area. At 2:09:24, Officer Guerra joined defendant to help guard the detainees.

Grant answered a call from his fiancée Mesa, who was on the street level, and said, "They're beating us up for no reason. I'm going to call you back." Mesa thought he sounded scared.[3]

Referring to Grant, Pirone said, "that motherfucker is going to jail" for "148," a reference to section 148, resisting a police officer. Pirone testified he gave the order to arrest Grant and Greer. Defendant thought Pirone told him to arrest Grant and Jackie Bryson. Pursuant to BART policy, Officers Pirone and Domenici were the officers in charge because they had been the first on the scene.

When he heard he was going to be arrested, Grant stood up and asked, "Who can we talk to?" A cell phone video shows Pirone grabbing Grant and forcing him back down. Defendant admitted he put his hand on Grant's head to help force him back down.

Jackie Bryson stood up. Defendant pushed Bryson back down into a seated position. He then pointed his Taser at Bryson and told him he needed to start listening or he was going to get "Tased." Bryson replied there would not be any problems. Defendant handcuffed Bryson without incident.

At this point, three officers—defendant, Pirone, and Guerra—were dealing with the five detainees, and two officers—Domenici and Woffinden—were keeping the crowd of bystanders away from the detention area.

Grant was kneeling on the ground. Pirone was yelling in Grant's face, "Bitch-ass nigger, right. Bitch-ass nigger, right. Yeah." Defendant stepped behind Grant and grabbed his hands. Grant fell forward onto the ground. Pirone thought defendant had forced Grant to the platform, but defendant denied this.

Pirone and defendant placed Grant on his stomach. Pirone used his knees to pin Grant's neck to the ground. Grant protested, "I can't breathe. Just get off of me. I can't breathe. I quit. I surrender. I quit." Defendant ordered Grant to give up his arms, presumably so he could handcuff him. Grant responded that he could not move. Defendant repeatedly pulled at Grant's right arm, which apparently was under Grant's body.

At 2:10:49, two more BART officers, Knudtson and Flores, arrived on the platform and ran to the detention area. Knudtson tackled one of the bystanders after he (or the person next to him) threw a cell phone at Domenici and

---

[3] Defendant testified that around this time Grant and Jackie Bryson were yelling, with obscenities, they were going to sue Pirone.

Woffinden, who were still keeping the crowd at bay. Flores took up position next to Domenici and Woffinden to help them keep the crowd back. Woffinden testified the officers succeeded in keeping the crowd out of the detention area. He never drew his firearm because the crowd's behavior did not warrant such a response.

Meanwhile, defendant was heard to exclaim, "fuck this." He told Pirone, "I can't get his hands, his hands are in his waistband, I'm going to tase him, . . . get back."

A cell phone video shows defendant tugging three separate times on his handgun, unsuccessfully trying to remove it from his holster. On the fourth try, defendant was able to remove his handgun. He stood up, held the weapon apparently with both hands, and fired a bullet into Grant's back. The time was 2:11:04.

Several witnesses said that defendant appeared surprised and dumbfounded after the shooting. One witness heard defendant say, "Oh, shit!" or "Oh, my God." Another heard defendant say, "Oh, shit, I shot him," or, "Oh God, oh shit, I shot him." Defendant holstered his handgun and put his hands to his head, then bent over and put his hands on his knees. Grant was still conscious and exclaimed, "Oh, you shot me, you shot me." Defendant handcuffed Grant and searched him for weapons. Grant was unarmed.

Shortly after the shooting, defendant talked to Pirone on the platform and said, "I thought he was going for a gun." In the minutes after the shooting he had several conversations on the platform with Pirone and three other officers, and said nothing about mistaking his handgun for his Taser. Later, at the station, he cried and told a support person, Officer Foreman, that he thought Grant was going for a gun. He did not say he mistook his handgun for his Taser.

Grant was taken to Highland Hospital. He had a single gunshot wound that penetrated his right lung and caused excessive blood loss. He died about three or four hours after having surgery.

### C. *Defendant's Testimony*

Defendant testified as follows.[4]

---

[4] We generally relate defendant's testimony without repeated qualifiers such as "Defendant testified that" or "According to defendant." It must be understood that what may appear to be unqualified statements of fact are defendant's version of events, which must be viewed in light of the jury's involuntary manslaughter verdict. ·

He did not intend to shoot Grant, but only to "Tase" him. He mistakenly drew and fired his handgun. As defendant approached Grant to arrest him, Grant was on his knees with both hands behind his back. Grant fell to the ground; defendant did not push him. Grant ended up on his stomach with his right hand underneath his body. Defendant focused on getting control of Grant's right arm, which was tense. Defendant could not free it by pulling it out or by ordering Grant to give up his arm. Defendant did not hear Grant complain that he could not breathe. Defendant did not notice that Pirone had restrained Grant by placing his knee on Grant's neck.

Defendant saw Grant's right hand go into his pocket as if he were grabbing for something. Although he did not see a weapon, he thought Grant might be reaching for one. He decided to "Tase" Grant. He stood up to get sufficient distance to properly deploy the Taser, and announced, "I'm going to tase him. I'm going to tase him."

Defendant was not aware he had mistakenly drawn his handgun until he heard the shot. He looked down and saw he was holding his handgun. He testified, "There were no flags that popped up, there were no red flags." He was unaware he had to tug at his handgun three times before freeing it from its holster, and did not notice the lack of a red laser sight which would have emanated from his Taser.

Defendant denied losing control of his emotions and judgment during the attempt to arrest Grant, and believed "Tasing" Grant would have been consistent with BART policy. Defendant voluntarily resigned from the BART police force on January 7, 2009.

### D. *Other Defense Evidence*

BART Police Sergeant Stewart Lehman testified that he trained defendant on the use of the Taser. The training was the minimum six and one-half hours. Lehman believed the training period was "a minimum," but admitted the training was up to industry standards and the standards set by POST (Commission on Peace Officer Standards and Training) and the Taser manufacturer. He testified that defendant did not have his own Taser and holster issued to him, which would have enabled him to practice at home.

Greg Meyer, a consultant in police tactics, testified as an expert in the "use and deployment of tasers, taser training methods and procedures, laws of arrest, arrest procedures, and the use of lethal and non-lethal force." In his opinion, Grant's reentering the BART train upon seeing Pirone and his standing up after being told to sit against the wall were sufficient to violate section 148—and thus, Grant was being lawfully arrested for resisting a police officer.

It was also Meyer's opinion defendant was entitled to rely, without question, on Pirone's order to arrest Grant. Meyer did acknowledge that Pirone's conduct was "loud and aggressive," and his calling Grant a "bitch-ass nigger" was aggressive behavior. He did opine, however, the use of a Taser on Grant would have been appropriate because Grant was physically, as opposed to passively, resisting arrest.

Meyer testified regarding six documented instances of handgun/Taser confusion in the United States and Canada between 2001 and 2006. In each of those six instances, the Taser was holstered on the dominant side of the officer's body, close to the officer's handgun, for a strong-hand draw. Meyer was unaware of the color of the Taser in each incident.

Meyer testified about defendant's Taser training. In his opinion, the training "could have been better" and "had some deficiencies." Meyer believed defendant's 10 practice draws during training were inadequate for defendant to develop "muscle memory" with the Taser, and that defendant should have had access to a Taser and holster after training so he could practice draws. (The record shows that BART did not issue individual officers their own Tasers.) In Meyer's opinion, defendant's training was insufficient to prevent handgun/Taser confusion and to alert defendant when he had drawn his handgun instead of his Taser.

William Lewinski, a retired university professor, testified as an expert about human performance in high-stress situations. He testified people in high-stress situations can become singularly focused on one thing, resulting in "inattentional blindness" whereby the mind blocks out competing stimuli. This condition, common in police officers under stress, can result in an officer resorting to automatic responses.

Lewinski described "muscle memory" as a motor function that becomes automatic with repetition. He believed it would take 500 to 3,000 repetitions of a particular movement to create muscle memory. In Lewinski's opinion, a police officer may, under stress, fail to notice the distinguishing features between his handgun and his Taser and confuse the two. Lewinski acknowledged that an officer angry at a suspect could deviate from his training.

Several BART officers testified that defendant was dependable and even tempered, and did not show a tendency to use inappropriate aggression toward suspects.[5]

---

[5] Defendant presented some other evidence, which we have considered but need not discuss. In particular, he presented the testimony of an expert in forensic image analysis, who disputed some of the content of the surveillance and cell phone videos. We have reviewed the videos and find they conform substantially to the material facts testified to by eyewitnesses, at least

### E. *The Verdict and Sentence*

As noted, the People had charged defendant with murder. The jury found defendant not guilty of murder or voluntary manslaughter and convicted defendant of the lesser included offense of involuntary manslaughter (§ 192, subd. (b)), and found true the enhancement that he personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)). On a motion for new trial, the trial court dismissed the firearm enhancement in the interests of justice (§ 1385), finding there was insufficient evidence to support it. The court denied probation and sentenced defendant to two years in prison for involuntary manslaughter.

## II. DISCUSSION

Defendant contends (1) there is insufficient evidence to support the jury's finding of criminal negligence necessary for a conviction for involuntary manslaughter; (2) the court should have granted a new trial based on newly discovered evidence of two additional instances of handgun/Taser confusion in other states; (3) the court erred by excluding evidence of postshooting remedial measures taken by BART involving Taser use and training; (4) there were various instructional errors; and (5) the trial court improperly relied solely on Grant's death to deny defendant probation. We disagree with these contentions for the following reasons.

### A. *The Sufficiency of the Evidence of Involuntary Manslaughter*

Defendant contends there is insufficient evidence of the requisite criminal negligence to sustain his conviction of involuntary manslaughter. Specifically, he contends he "accidentally fired his gun" and Grant's death was "a tragic error." Primarily, he proposes a new, higher standard for involuntary manslaughter applicable to police officers who kill in the line of duty. He fashions this proposed standard from out-of-state authority and civil rights decisions arising under title 42 United States Code section 1983. We are compelled to follow controlling California authority and decline to adopt defendant's proposed standard. We find sufficient evidence to sustain the involuntary manslaughter conviction, for reasons we now discuss.

The standard of review of the sufficiency of the evidence to support a conviction is well known. (See *People v. Mincey* (1992) 2 Cal.4th 408, 432 [6

---

insofar as the material issues on appeal are concerned. Notably, the depictions in the videos were reviewed by the jury, which was entitled to weigh their content against the defense expert's testimony and reach its verdict.

Cal.Rptr.2d 822, 827 P.2d 388].) In reviewing the entire record, the sole function of the appellate court is to review the evidence in the light most favorable to the judgment, presume in support of the judgment every fact that can be reasonably deduced from the evidence, and "determine . . . whether a reasonable trier of fact could have found that the prosecution sustained its burden of proof beyond a reasonable doubt." (*Ibid.*; see *People v. Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].) The evidence must be "reasonable, credible, and of solid value." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) We draw all reasonable inferences in support of the judgment. (*People v. Wader* (1993) 5 Cal.4th 610, 640 [20 Cal.Rptr.2d 788, 854 P.2d 80].) Reversal is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to [support the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

■ We first address defendant's contention that Grant's killing was an "accident." In the context of the law of homicide, a killing through accident or misfortune is excusable and is not a crime. (§ 195, subd. 1.) For a killing to be "accidental," a defendant must act without negligence. (§ 195, subd. 1; see *People v. Villanueva* (2008) 169 Cal.App.4th 41, 54 & fn. 12 [86 Cal.Rptr.3d 534].) Here, the jury was so instructed with a version of CALCRIM No. 510 containing additional language favorable to the defense.[6] Nevertheless, the jury found defendant guilty of a criminally negligent killing. The guilty verdict of involuntary manslaughter, which we conclude is

---

[6] The trial court instructed the jury as follows, consistent with CALCRIM No. 510. (CALCRIM is the recognized acronym for Judicial Council of California Criminal Jury Instructions.) The italicized language are additions and modifications to the instruction made by the trial court.

"The defendant is not guilty of murder or the lesser crime of voluntary manslaughter or involuntary manslaughter if he killed someone as a result of accident. Such a killing is excused, and therefore not unlawful, if:

"1. The defendant was *a peace officer* and was doing a lawful act in a lawful way;

"2. The defendant was acting with usual and ordinary caution *expected of a reasonably careful peace officer in the same or similar situation*;

"AND

"3. The defendant was acting without any unlawful intent.

"*A peace officer* [(the instruction says, 'A person')] acts with usual and ordinary caution if he acts in a way that a reasonably careful *peace officer* [(again, instead of 'person')] would act in the same or similar situation.

"*The defendant is not guilty of involuntary manslaughter if he acted accidentally without criminal negligence. You may not find the defendant guilty of involuntary manslaughter unless you are convinced beyond a reasonable doubt that he acted with criminal negligence. Criminal negligence is defined in another instruction.*

"The People have the burden of proving beyond a reasonable doubt that the killing was not excused. If the People have not met this burden, you must find the defendant not guilty of murder and the lesser included crimes of voluntary and involuntary manslaughter."

supported by substantial evidence, is simply inconsistent with the characterization of the killing as "accidental."

■ Defendant claims the trial court, in the process of finding the firearm enhancement unsupported by sufficient evidence, made a finding of fact that the killing was accidental. A fair reading of the record convinces us otherwise. A firearm-use enhancement under section 12022.5, subdivision (a) requires an element of intent. (CALCRIM No. 3146; see *In re Tameka C.* (2000) 22 Cal.4th 190, 197 [91 Cal.Rptr.2d 730, 990 P.2d 603].) In discussing its conclusion that the evidence shows defendant did not intentionally use his handgun to kill Grant, the trial court on several occasions referred to the lack of intent as "accidental." On one occasion the court stated, "The evidence that this was an accidental shooting and that [defendant] did not intend to pull his gun and shoot Grant is in the court's view simply overwhelming." But the court also referred to the shooting as "unintentional." It is clear to us the trial court was using "accidental" and "unintentional" interchangeably. The precise finding of fact the court made was that the shooting was unintentional.

The trial court expressed support for the verdict of involuntary manslaughter, which is of course an unintentional killing. On one occasion, the court stated: "But because the jury accepted the defense of weapons confusion, and that's the finding that the court believes was made here, the issue on the involuntary manslaughter charge was whether or not in mistakenly drawing his firearm and shooting Mr. Grant [defendant] acted in a grossly negligent manner. The jury found that he did."

In fact, the trial court *denied* the motion for new trial with regard to the sufficiency of the evidence for involuntary manslaughter: "Regarding the motion for new trial for insufficient evidence to support the involuntary manslaughter conviction, I believe this morning I said it was my intention to respect the jury's verdict in that regard, and I do respect it. I think that that was a decision for the jury to make. If they found that [defendant] had acted in a grossly negligent manner, he was guilty of involuntary manslaughter *and that is the finding they made. I think that the evidence in the case supports it.*" (Italics added.)

We turn now to the question of the sufficiency of the evidence for involuntary manslaughter.

■ Section 192 defines manslaughter as "the unlawful killing of a human being without malice." Section 192, subdivision (b) defines involuntary manslaughter in two ways: as a killing in "the commission of an unlawful act, not amounting to felony" or a killing "in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."

 The jury was properly instructed on both theories of involuntary manslaughter, with section 149 (police officer unnecessarily assaulting any person) the misdemeanor in support of the first theory. The governing mens rea for both theories of involuntary manslaughter is criminal negligence. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1007 [114 Cal.Rptr.3d 696] (*Butler*).)[7]

 We need only briefly discuss the first prong of manslaughter liability, i.e., misdemeanor manslaughter. The jury was instructed that it could find defendant guilty of manslaughter if it found he violated section 149, which provides that a peace officer may not, "under color of authority [and] without lawful necessity, assault[] or beat[] any person." Specifically, the trial court instructed the jury that it could find defendant guilty of violating section 149 if, while arresting Grant, he used "more force than was necessary under the circumstances." There is evidence that Grant was on the ground, being pinned by Pirone, and complaining that he could not breathe. Grant verbally surrendered. The jury could have concluded he was not a threat and defendant did not have to "Tase" him. And, since Grant was unarmed, no other officer had drawn his or her weapon, and the dispatch specifically said that no weapons were involved in the fight on the train, defendant did not have to use deadly force.

But we believe the controlling issue is not whether defendant violated section 149 while he was arresting Grant. We find sufficient evidence that his conduct of mistakenly drawing and firing his handgun instead of his Taser constitutes criminal negligence under the second prong of manslaughter liability: that defendant committed a lawful act in an unlawful manner, or without due caution and circumspection—i.e., he believed he was "Tasing" an arrestee, but mistakenly, *and criminally negligently*, drew and fired his handgun with lethal results.

The definition of criminal negligence in California has been settled since 1955, when the California Supreme Court adopted the definition set forth in American Jurisprudence: " '[T]here must be a higher degree of negligence than is required to establish negligent default on a mere civil issue. The negligence must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinary prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to the consequences.' " (*People v. Penny* (1955) 44 Cal.2d 861, 879 [285 P.2d 926] (*Penny*), quoting 26 Am.Jur.

---

[7] There is a third, nonstatutory, theory of involuntary manslaughter (*Butler, supra,* 187 Cal.App.4th at p. 1007) which we need not discuss in this opinion.

(1940) Homicide, § 210, p. 299; see *Penny, supra,* at p. 880 [formally adopting this rule as Cal. law].)

Five years after *Penny,* an appellate court stated the definition as follows: "[A]n act is criminally negligent when a man of ordinary prudence would foresee that the act would cause a high degree of risk of death or great bodily harm. The risk of death or great bodily harm must be great. [Citation.]" (*People v. Rodriguez* (1960) 186 Cal.App.2d 433, 440 [8 Cal.Rptr. 863].) And more recently, a court defined criminal negligence as "conduct [that is] such a sharp departure from the conduct of an ordinarily prudent person that it evidences a disregard for human life, and raises a presumption of conscious indifference to the consequences. [Citations.]" (*People v. Oliver* (1989) 210 Cal.App.3d 138, 146–147 [258 Cal.Rptr. 138].)

CALCRIM No. 580 defines criminal negligence as follows. Defendant's jury was so instructed with CALCRIM No. 580, but with additional language we will discuss below.

"A person acts with criminal negligence when:

"1. He or she acts in a reckless way that creates a high risk of death or great bodily injury;

"AND

"2. A reasonable person would have known that acting in that way would create such a risk.

"In other words, a person acts with criminal negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act."

It is important to distinguish between the mental states for involuntary manslaughter on the one hand, and implied malice murder, of which the jury found defendant not guilty, on the other. "Implied malice contemplates a subjective awareness of a higher degree of risk than does gross [(i.e., criminal)] negligence, and involves an element of wantonness which is absent in gross negligence. [Citations.]" (*People v. Watson* (1981) 30 Cal.3d 290, 296 [179 Cal.Rptr. 43, 637 P.2d 279] (*Watson*).) "A finding of gross negligence is made by applying an *objective* test: if a *reasonable person* in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness. [Citation.] However, a finding of

implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard. [Citation.]" (*Id.* at pp. 296–297.)

There are several instructive California involuntary manslaughter cases involving the negligent handling or discharge of a firearm. (See, e.g., *In re Dennis M.* (1969) 70 Cal.2d 444, 449, 461 [75 Cal.Rptr. 1, 450 P.2d 296] [defendant, knowing his handgun had recently been loaded and uncertain whether he had emptied it of all bullets, pointed it at the victim's head and deliberately pulled the trigger twice while hugging the victim], disapproved on another, unrelated ground as recognized in *In re Joseph G.* (1970) 7 Cal.App.3d 695, 704 [87 Cal.Rptr. 25]; *People v. Carmen* (1951) 36 Cal.2d 768, 776–777 [228 P.2d 281] [murder conviction; defendant entitled to involuntary manslaughter instruction because he testified he had no intent to shoot anyone; was carrying a gun with a round in the firing chamber, pointed forward, while approaching an occupied vehicle; and stumbled and the gun went off]; *People v. Cazares* (1987) 190 Cal.App.3d 833, 835, 837–838 [235 Cal.Rptr. 604] [defendant fired handgun through closed door into a crowded dancehall]; see also cases collected in 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against the Person, § 228, p. 839.)

At least two reported California involuntary manslaughter cases involve police officers. In *People v. Sidwell* (1915) 29 Cal.App. 12 [154 P. 290] (*Sidwell*), the defendant was a special police officer commissioned by a lumber company to keep order in a company town in Lassen County. To give him the necessary authority he was appointed a deputy sheriff of the county. (*Id.* at pp. 13–14.) The defendant went out one midnight to see if there was illegal gambling going on in any of the company's lodging or bunkhouses. Hearing what he believed to be the noise of gambling from within a lit room, the defendant drew his .38 Colt revolver, placed it in his left hand, and broke open the door with his right. As he did so, the weapon discharged, killing a man who was sitting with his back to the door. (*Id.* at p. 15.) The court upheld the defendant's involuntary manslaughter conviction, noting that handling a loaded firearm in a public place was always fraught with danger, and that danger was increased when the defendant was focused on something other than the weapon—i.e., the forcing of the door. The court held it was "gross or culpable negligence" to force the door, "with his mind centered upon getting into the room," while holding a loaded weapon. (*Id.* at p. 21.)

In *People v. Velez* (1983) 144 Cal.App.3d 558 [192 Cal.Rptr. 686] (*Velez*), the defendant, a municipal police officer, returned to the police station, removed the magazine from his weapon, ejected the round in the chamber, placed it in the magazine and replaced the magazine in the weapon. At that point, it could only be fired by working the slide to feed a round into the

chamber. (*Id.* at p. 562.) The defendant left the weapon out where it was handled by two juveniles working as janitors at the station. The defendant then pointed the weapon at a third juvenile, an office assistant, joking that she was stealing money. The weapon discharged, killing the office assistant. (*Ibid.*) The court upheld the verdict of involuntary manslaughter, because the defendant failed to perceive the risk of pointing a potentially hazardous weapon at the victim. Pointing the gun at the victim even though the defendant knew another juvenile had handled it evidenced a " 'disregard for human life or an indifference to consequences' " to warrant the jury's finding of involuntary manslaughter. (*Id.* at pp. 566–568.)[8]

We know of no California case in which a police officer was convicted of involuntary manslaughter due to handgun/Taser confusion. But we believe this record demonstrates substantial evidence that defendant's conduct was criminally negligent due to the following evidence.

First, the jury could have reasonably found defendant did not need to use a Taser at all. Regardless of the question whether Grant initially resisted arrest, at the time defendant decided to use his Taser, the jury could have reasonably found that Grant was immobilized—being pinned by Pirone—and compliant. Grant said, "I can't breathe," "I quit," and "I surrender." Although defendant was having difficulty obtaining control of Grant's hand, the jury could have found in view of Grant's position and demeanor that this did not present a proper situation for the use of a Taser.

■ Second, the jury could have reasonably found that when defendant did decide to use his Taser he was criminally negligent in mistaking his handgun for his Taser. Defendant's handgun was peculiarly distinguishable from his Taser for a number of reasons. Defendant had drawn his Taser earlier. The handgun weighed more than three times as much as the Taser. The Taser was bright yellow. The handgun was black. The Taser had an on/off safety switch. The handgun did not. The Taser had a red laser sight. The handgun did not. The handgun was holstered on defendant's right, or dominant side, with a two-step release mechanism requiring defendant to push down and forward and then back on a separate safety switch. The Taser, in contrast, was holstered on defendant's left, or nondominant side, for a

---

[8] But see factually distinguishable *Somers v. Superior Court* (1973) 32 Cal.App.3d 961, 963, 966–970 [108 Cal.Rptr. 630] (*Somers*) (in the dark, in an area plagued by armed robberies, officer mistakenly identified a group of three young men, carrying sticks, as armed robbery suspects carrying shotguns; one young man died when police fired on them when they fled and did not heed orders to stop; officer found not to have disregard for life or indifference to the consequences of his actions; writ of prohibition issued to restrain prosecution for involuntary manslaughter). *Somers* utilized the same analysis as *Velez, supra,* 144 Cal.App.3d 558, but found the circumstances did not manifest a disregard of human life or an indifference to consequences.

cross-draw by defendant's right hand and had only a safety strap and safety hood. After some of the handgun/Taser confusion incidents referred to above, three police agencies changed their Taser policies to require nondominant-side holstering and the Taser's bright yellow color as measures to prevent handgun/Taser confusion. A reasonable jury could conclude that a reasonably prudent person could distinguish between the two weapons, and drawing the deadly weapon—heavier, of a different color, and on the dominant side of the body with a complicated release mechanism under the circumstances—amounted to criminal negligence. Thus, the jury could have reasonably found defendant's conduct rose to the level of conscious indifference to the consequences of his acts, and was not a mere mistake.

This conclusion is supported by two additional facts. First, defendant twice drew his Taser on the platform shortly before the shooting, strongly suggesting he was familiar with the weapon and its location on his body. Second, a cell phone video shows him struggling to remove his handgun from his holster three times immediately prior to freeing the weapon and shooting Grant. A reasonable jury could conclude a reasonably prudent person would have known he was holding his deadly handgun and not his nonlethal Taser.

Defendant asserts he was "badly trained" on the use of the Taser. He presented evidence that his training was inadequate. But the record shows defendant had six and one-half hours of Taser training, which included 10 to 15 practice draws and three scenario trainings. During the training, defendant practiced drawing the Taser from a holster on the nondominant side with his dominant hand. The training's content and length complied with industry standards as set forth by the Taser manufacturer and POST. A defendant's lack of awareness of the risk of his conduct—e.g., by allegedly inadequate training—"would not preclude a finding of gross negligence if a reasonable person would have been so aware." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1205 [26 Cal.Rptr.2d 23, 864 P.2d 103] (*Ochoa*).) Thus, if a reasonable person would not have confused his handgun with his Taser, the state of training is marginally pertinent to the determination of criminal negligence.

Defendant presented expert testimony from William Lewinski that people in high-stress situations can become singularly focused on one thing, resulting in "inattentional blindness" whereby the mind blocks out competing stimuli. In Lewinski's opinion, a police officer under stress, with muscle memory with his handgun, may fail to notice the distinguishing features between his handgun and his Taser and confuse the two.

There are several possible reasons the jury was unpersuaded by this evidence. The jury may have concluded the evidence showed that defendant was simply criminally negligent for all the reasons discussed above, for

failing to notice his difficulty in drawing his weapon, and seemingly being unaware of much of his surroundings—for instance, Grant's protests that he could not breathe and the fact Pirone had Grant pinned down. Defendant also admitted, "There were no flags that popped up, there were no red flags" as he drew and fired his gun.

The jury also heard evidence that in the past 10 or 11 years, several hundred thousand, if not a million, Tasers had been deployed by 13,000 police agencies across the United States. In all that time, with all those deployments, the jury was told there were only six documented instances of Taser/handgun confusion in the United States and Canada. The jury could reasonably have concluded "inattentional blindness" is uncommon and is not something suffered by a reasonably prudent person.

Finally, the jury could reasonably have concluded the situation on the platform was not an extreme high-stress situation at the time of the shooting itself. There were seven officers on the platform, the detainees were under control, and the crowd from the train was being held back. Apparently, no other officer drew a firearm. The officers were shocked when defendant fired on Grant. Also, defendant's use of the phrase "fuck this" just before he shot Grant could, in the minds of the jury, bespeak a tone of recklessness about subduing the suspect.

The judge instructed the jury regarding its duty in part with CALCRIM No. 200: "[Y]ou must decide what the facts are. It is up to all of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial. [¶] Do not let bias, sympathy, prejudice, or public opinion influence your decision. . . ." The record shows a conscientious jury did so.

We conclude there is sufficient evidence from which the jury could legitimately have found that defendant acted with the requisite criminal negligence to support his conviction for involuntary manslaughter.

 But defendant, relying primarily on out-of-state authority, asks us to fashion a higher standard for involuntary manslaughter for police officers who kill in the line of duty.[9] Defendant argues an officer should not be criminally liable for an on-duty shooting unless his conduct was "such a departure from the norm of reasonable police conduct that it may fairly be characterized as 'extraordinary and outrageous[,]' . . . [and] qualifies as a 'wanton and abandoned disregard of human life.' " (*Pagotto v. State* (1999)

---

[9] Defendant describes his proposed new standard as governing "the accidental, on-duty firing of the gun [the officer] is required to carry and use . . . ." As we, and the jury, have concluded, Grant's killing was *not* accidental.

127 Md.App. 271 [732 A.2d 920, 966] (*Pagotto*).)[10] This court is not blind to the stress and danger of police service; but neither can we ignore established California law of involuntary manslaughter. That law established the definition of criminal negligence and makes no exceptions for any particular occupation. Such an exception would, we presume, be a matter for the Legislature and not for the courts.

Defendant relies primarily on two Maryland decisions, *State v. Albrecht* (1994) 336 Md. 475 [649 A.2d 336] (*Albrecht*) and *Pagotto*.

█ *Albrecht* is the source for part of the *Pagotto* standard: that of a "reasonable police officer," another way of stating "the norm of reasonable police conduct." *Albrecht* states, in the context of an on-duty killing by a police officer, that the Maryland law of involuntary manslaughter provides that the standard of criminally negligent conduct is not that of a "reasonable civilian," but a "reasonable police officer." (*Albrecht, supra*, 649 A.2d at p. 349.) This Maryland legal principle is out of sync with California law, which follows the objective "reasonable person" standard—the trier of fact is required to evaluate the conduct of a reasonable person in the defendant's position. (*Watson, supra*, 30 Cal.3d at p. 296; see *Ochoa, supra*, 6 Cal.4th at p. 1205 [the jury should consider all relevant circumstances surrounding the defendant's conduct].) This enables the jury to evaluate the conduct of a reasonable person functioning as a police officer in a stressful situation—but this is not the same as following a special "reasonable police officer" standard.

█ The reasonable person standard for public officers' conduct involving use of force has been the measuring stick in California. For example, although section 196, justifiable homicide by public officers, is not a defense under the circumstances of this case, it relies on the reasonable person standard. Section 196 states in part: "Homicide is justifiable when committed by public officers . . . [¶] . . . [¶] . . . [w]hen necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty . . . ." In a case construing section 196 involving a fish and game commissioner convicted of shooting and killing a resisting Native American engaged in unlawful fishing, the court explained the defendant "may use all the force 'that appears to him as a reasonable man to be necessary to overcome all resistance, *even to the taking of life*,' . . . ; the resistance must be such as appears to the officer likely to inflict great bodily injury upon himself or those acting with him. Otherwise there is no necessity to take life and it cannot be permitted." (*People v. Bond* (1910) 13 Cal.App.

---

[10] *Pagotto*, a decision of the Court of Special Appeals of Maryland, was affirmed by the Court of Appeals of Maryland. (*State v. Pagotto* (2000) 361 Md. 528 [762 A.2d 97].)

175, 189–190 [109 P. 150].) The court emphasized the force should be no more than appeared necessary to him as a reasonable man (person).[11]

In any case, defendant's jury *was* instructed with the standard of "reasonable peace officer." CALCRIM No. 580 uses the phrase "reasonable person." But when the trial court instructed defendant's jury, it substituted the term "reasonable peace officer," and thus, instructed as follows:

"Criminal negligence involves more than ordinary carelessness, inattention, or mistake in judgment. In this case, *you must judge the acts of defendant as a peace officer. A peace officer* acts with criminal negligence when:

"1. He [or she] acts in a reckless way that creates a high risk of death or great bodily injury;

"AND

"2. A reasonable *peace officer* [(changed from 'person')] would have known that acting in that way would create such a risk.

"In other words, a *peace officer* [(changed from 'person')] acts with criminal negligence when the way he [or she] acts is so different from the way an ordinarily careful *peace officer* [(changed from 'person')] would act in the same situation that his [or her] act amounts to disregard for human life or indifference to the consequences of that act."

The court instructed with additional language: "In considering whether the defendant's conduct was criminally negligent, you must not consider the consequences of that conduct. You must focus on the question of whether the defendant's conduct itself was reckless and whether his actions were such a departure *from the actions of a reasonable peace officer in the same circumstances* that his acts amounted to a disregard for human life or indifference to the consequences of his acts."

---

[11] *People v. Humphrey* (1996) 13 Cal.4th 1073, 1083 [56 Cal.Rptr.2d 142, 921 P.2d 1], involving the objective "reasonable person" standard of self-defense, is also instructive. Because the jury was required to consider reasonableness from the point of view of a reasonable person in the defendant's position, the jury was required to consider the effect of having been a battered woman. (*Id.* at pp. 1083, 1086–1087.) But the court cautioned that it was not "replacing the reasonable 'person' standard with a reasonable 'battered woman' standard." (*Id.*. at p. 1087.) "The jury must consider defendant's situation and knowledge, which makes the evidence relevant, but the ultimate question is whether a reasonable *person*, not a reasonable battered woman, would believe in the need to kill to prevent imminent harm." (*Ibid.*)

Thus, defendant benefited from a higher standard of criminal negligence than that required by existing California law.[12] And under that standard, the jury still found criminal negligence.

■ Defendant relies heavily on *Pagotto*. We find this prolix decision somewhat disjointed—and, in any case, its ruling is markedly inconsistent with California law. In the first place, it appears to conflate the mental states for involuntary manslaughter and second degree implied malice, or depraved heart, murder. (*Pagotto, supra,* 732 A.2d at p. 954.) As such, the decision incorporates "wantonness" into its definition of gross negligence. This concept is obviously not consistent with California law. Implied malice has an "element of wantonness which is absent in gross negligence. [Citations.]" (*Watson, supra,* 30 Cal.3d at p. 296; see *People v. Crow* (1941) 48 Cal.App.2d 666, 672 [120 P.2d 686] [wantonness not a required element of proof for criminal negligence].)

In the second place, *Pagotto* inexplicably looks for guidance to *civil punitive damage cases,* from which the Maryland decision derives the element of "wantonness" in its definition of criminal negligence and also derives the standard of "extraordinary and outrageous" conduct. (*Pagotto, supra,* 732 A.2d 957–958, 966.) We find that punitive damage cases are irrelevant here, and they do not state the proper standard of criminal negligence under California law.

■ Defendant also relies, as did *Pagotto, supra,* 732 A.2d at pages 961–965, on civil rights cases arising under title 42 United States Code section 1983. Defendant relies on *Torres v. City of Madera* (9th Cir. 2008) 524 F.3d 1053, and *Henry v. Purnell* (4th Cir. 2007) 501 F.3d 374, both of which involve handgun/Taser confusion. But civil rights cases involve standards different from those of the general criminal law. They typically involve alleged violations of constitutional rights enshrined in the Fourth and Eighth Amendments to the United States Constitution, as protection against governmental conduct which is physically abusive. The validity of the allegations is judged by referring to the specific constitutional standard at issue, not "some generalized 'excessive force' standard. [Citations.]" (*Graham v. Connor* (1989) 490 U.S. 386, 394 [104 L.Ed.2d 443, 109 S.Ct. 1865].) Liability under title 42 United States Code section 1983 is premised on the violation of constitutional rights, "not for violations of duties of care arising out of tort law." (*Baker v. McCollan* (1979) 443 U.S. 137, 146 [61 L.Ed.2d 433, 99 S.Ct. 2689].) The United States Supreme Court has expressly rejected a standard of recklessness or gross negligence in such civil rights cases, ruling that actionable governmental conduct "rise[s] to the conscience-shocking level.

---

[12] Defendant also benefited from a "reasonable peace officer" standard in the trial court's instruction on accident. (See fn. 6, *ante.*)

[Citation.]" (*County of Sacramento v. Lewis* (1998) 523 U.S. 833, 849 [140 L.Ed.2d 1043, 118 S.Ct. 1708]; see *id.* at pp. 848–854.)

In sum, we conclude the evidence is sufficient to support the involuntary manslaughter verdict under controlling California law.[13]

## B. *The Denial of a New Trial Based on Newly Discovered Evidence of Handgun/Taser Confusion*

Defendant contends the trial court erred by denying his motion for new trial based on newly discovered evidence: two additional instances of handgun/Taser confusion discovered after the verdict. We disagree with defendant's contention for the following reasons.

As noted, defendant presented evidence of six instances of handgun/Taser confusion in the United States and Canada between 2001 and 2006. In each of those six instances, the Taser was holstered on the dominant side of the officer's body, close to the officer's handgun, for a strong-hand draw. Also, the defense expert who testified regarding the six instances was unaware of the color of the Taser in each incident.

The prosecutor focused pointedly on these six instances in his rebuttal argument. He stressed Meyer's testimony that 13,000 police agencies used Tasers, which Meyer believed had been fired hundreds of thousands, if not millions, of times. Noting the absence of an instance of handgun/Taser confusion involving a Taser holstered on the nondominant side, the prosecutor emphatically argued: "And if there was a case where an officer pulled his gun and shot someone where he meant to pull it from his support side, his non-dominant side, trust me, you would have heard about it. In almost a million or more instances of tasers being fired, this has never happened. Never happened. If it had, you would have heard about it." And shortly thereafter he continued the argument: "[N]ever before, never before has there been an instance where an officer has confused his taser for his gun where the taser was being held on the opposite side of the gun. It's never happened. To this day it's never happened."

---

[13] At oral argument, defendant contended that the few published police shooting involuntary manslaughter cases, such as *Velez, supra,* 144 Cal.App.3d 558 and *Sidwell, supra,* 29 Cal.App. 12, involved a factual context of reckless behavior—such as leaving a weapon lying around for teenage custodians to play with, or breaking down a door while holding a gun—that is absent from this case. Defendant argued that were we to affirm his conviction, it "would completely change the nature of policing in this state" by rendering police officers criminally liable for "mistaken" shootings. We understand defendant's argument, but we believe that each case is decided on its own unique facts and under well-established law requiring a high standard of proof. And the facts of this case are unusual, if not unique.

The jury returned its verdict on July 8, 2010. Defendant moved for a new trial on various grounds, including newly discovered evidence of two additional instances of handgun/Taser confusion *where, as here, the Taser was holstered on the nondominant side for cross-draw by the dominant hand.*

Defense counsel submitted a declaration that, prior to trial, defense expert Meyer had searched the relevant literature and spoken with colleagues, and believed that "there were no other reported taser cases" other than the six referred to above.

Nevertheless, Meyer and defense counsel both learned on July 17, 2010, of an earlier April 2008 incident in Kentucky where the officer had his handgun holstered on his dominant side and his Taser—as here, colored yellow—holstered on his nondominant side for dominant-hand cross-draw. Intending to draw his Taser, the officer pulled his handgun by mistake and inflicted a nonfatal wound. Defense counsel learned on October 19, 2010, of a second instance in Mesa, Arizona, in May 2004, where the officer had his handgun holstered on his dominant side and his Taser—black with yellow markings on the rear and sides—holstered on his nondominant side for dominant-hand cross-draw. Like the Kentucky officer, the Arizona officer intended to draw his Taser, but pulled his handgun by mistake and inflicted a nonfatal wound.[14]

The People argued the defense could have discovered the evidence earlier with due diligence, and the evidence was cumulative and not likely to have changed the jury's verdict.

The trial court found that "neither the prosecution nor the defense was aware of the existence of these incidents," and that "the defense could not have discovered these incidents with reasonable diligence."

But the court denied the new trial motion on the ground the two incidents "would have added little to the trial." The court noted that, to the extent the two incidents supported defendant's claim he mistook his handgun for his Taser, the jury's verdict of involuntary manslaughter—i.e., a negligent killing—showed that it accepted defendant's testimony regarding that mistake.

The court "under[stood] the defense's concern about the [prosecutor's] argument that there had never been a case of weapons confusion involving tasers in the cross-draw dominant-hand position," and "acknowledge[d] that evidence of these facts, if admitted, would have bolstered the defense

---

[14] Meyer learned of the 2008 Kentucky case in a July 17, 2010 message to him from TASER International, Inc. Defense counsel learned of the 2004 Arizona case on October 19, 2010, while consulting with an associate professor and research scientist he had hired to help prepare for sentencing.

argument that [defendant's] acts were a tragic accident." But the court, nevertheless, concluded that "evidence of the Kentucky incident and the Arizona incident would not have assisted the jury in a meaningful way in making the decision whether or not [defendant's] actions were grossly negligent. I find the probative value of the newly discovered evidence, while helpful to the defense, is insufficient to support the granting of a new trial . . . ."

██ A trial court may grant a new trial motion "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (§ 1181, subd. 8.) In ruling on such a motion, the trial court considers several factors: " ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328 [19 Cal.Rptr.2d 529, 851 P.2d 811] (*Delgado*).)

A new trial motion based on newly discovered evidence is looked upon with disfavor. We will only disturb a trial court's denial of such a motion if there is a clear showing of a manifest and unmistakable abuse of discretion. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1251–1252 [74 Cal.Rptr.2d 212, 954 P.2d 475]; *Delgado, supra*, 5 Cal.4th at p. 328.)

We need not address the question whether, as the trial court found, defendant could not have discovered the evidence with reasonable diligence. We conclude the trial court did not abuse its discretion by denying the new trial motion because the new evidence would have added little to the trial and would not have rendered a different result probable on retrial. The Kentucky and Arizona incidents were essentially cumulative on the issue of criminal negligence and of marginal relevancy due to their situational facts.

Defendant was governed by an objective "reasonable person" standard. The jury was given ample evidence to support its verdict that, on New Year's Day 2009 on the Fruitvale BART platform, defendant acted with criminal negligence by drawing and firing his handgun instead of his Taser under the circumstances presented to him. The fact that two other police officers made a similar mistake from a cross-draw, nondominant-side holster is largely irrelevant to defendant's conduct and cumulative on the issue of guilt. It is true that the prosecutor made use of the purported nonexistence of any such mistakes from a cross-draw, nondominant-side holster. But the jury viewed the evidence as a whole, including the fact that Tasers were properly

discharged hundreds of thousands of times by police officers in 13,000 agencies without the sort of fatal mistake that happened in this case. Furthermore, the jury was charged with assessing defendant's conduct by the standard of a reasonable person in defendant's position. That position, as the Attorney General observes, was unique to defendant, and involved the situation on the platform, the number of fellow officers present to assist and control the crowd, and so forth. The information involving the Kentucky and Arizona officers was, as the trial court properly found, insufficient to warrant a new trial.

We note defendant had ample opportunity to present his defense that he drew his handgun by mistake and without negligence. This opportunity included expert testimony regarding "inattentional blindness" and an instinctive drawing of the handgun due to lack of "muscle memory" in drawing the Taser. In further support of his defense of mistake, the jury was presented with expert testimony that holstering the Taser on the nondominant side would not necessarily prevent handgun/Taser confusion if the Taser were holstered to be drawn with the dominant hand. The jury rejected the defense and found defendant acted with criminal negligence. The trial court properly concluded that anecdotal evidence of two other handgun/Taser confusion incidents would have added little to the jury's evaluation of defendant's conduct and did not rise to the level of the type of new evidence to warrant a new trial.

We see no manifest and unmistakable abuse of discretion in denying the new trial motion on this ground.

### C. Exclusion of Evidence That BART Changed Its Taser Policy After Grant's Death

Defendant moved to admit evidence that after the Grant shooting BART changed its Taser policy. Specifically, BART suspended the use of Tasers for a time and then instituted new requirements for Taser handling. BART mandated its officers to carry Tasers only on the nondominant side of the body, and that officers draw their Tasers only with the nondominant hand. Defendant argued the Taser policy change showed that BART recognized the manner in which defendant holstered his Taser (on the nondominant side, but for drawing by the dominant hand) could lead to handgun/Taser confusion.

The trial court excluded the evidence, finding it had "a marginal relevance at best." Referring to Evidence Code section 352, the court found the

evidence "clearly invites speculation, and gets us off into an area that I don't think is appropriate . . . ."[15]

Defendant contends the trial court erred because it deprived him of his defense to the involuntary manslaughter charge. He argues the evidence would have shown BART had a faulty Taser policy and provided inadequate training for Taser use at the time of the Grant shooting. He insists the evidence would have been probative on the question whether the shooting was the result of criminal negligence or faulty training and Taser policy.[16]

Evidence of remedial measures is generally inadmissible under section 1151: "When, after the occurrence of an event, remedial or precautionary measures are taken, which, if taken previously, would have tended to make the event less likely to occur, evidence of such subsequent measures is inadmissible to prove negligence or culpable conduct in connection with the event." The policy of the statute is straightforward. "The admission of evidence of subsequent repairs to prove negligence would substantially discourage persons from making repairs after the occurrence of an accident." (Cal. Law Revision Com. com., 29B pt. 3B West's Ann. Evid. Code (2009 ed.) foll. § 1151, p. 450.)

Defendant claims section 1151 does not apply to a criminal trial. At least one case has applied it to criminal proceedings. In *People v. Lockheed Shipbuilding & Constr. Co.* (1975) 50 Cal.App.3d Supp. 15 [123 Cal.Rptr. 778] (*Lockheed*), the defendants were charged with numerous misdemeanor Labor Code violations, many of which explicitly alleged gross negligence, which led to an explosion and fire. (*Lockheed, supra,* at p. Supp. 19; see *id.* at pp. Supp. 21–22, fn. 1.) The court held the trial court erred by admitting evidence of remedial measures because the jury might have considered the evidence on the issue of "the possibility or feasibility of eliminating the cause or results of the accident . . . ." (*Id.* at p. Supp. 35.) The opinion is unclear, but presumably the court was referring to the negligence issue, i.e., the jury might have found negligence from the remedial measures evidence and used it to "conclude . . . that had such measures been undertaken the explosion would have been averted." (*Ibid.*)

The Attorney General argues the remedial measures in this case were properly excluded under section 1151 because the policy of encouraging

---

[15] In this part of the opinion, statutory references are to the Evidence Code unless otherwise indicated.

[16] At sentencing, in the course of listing all persons and factors that contributed to the shooting, the trial court stated, "BART contributed as well by setting [defendant] up for failure due to inadequate taser training." We do not understand this statement because there is substantial evidence in the record that defendant had received standard Taser training.

such measures would be served in two ways: (1) BART's avoidance of its own potential criminal liability and (2) the possibility of civil liability in the wake of a finding that defendant was criminally negligent. We need not decide the issue of the precise application of section 1151 here, or consider the precise holding of *Lockheed*, because the trial court properly excluded the evidence under section 352.[17]

■ That statute requires the trial court "to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption." (*People v. Cudjo* (1993) 6 Cal.4th 585, 609 [25 Cal.Rptr.2d 390, 863 P.2d 635] (*Cudjo*).) The trial court excludes the evidence if these dangers substantially outweigh the evidence's probative value. (*Ibid.*) We review a trial court's ruling under section 352 for abuse of discretion. (*Cudjo, supra*, at p. 609.)

We see no abuse of discretion in this case. We have already noted that the state of defendant's Taser training was of doubtful relevance to the question whether he behaved as a reasonable person under the facts in this record, especially given the differences in color, weight, and location on the body of defendant's handgun and Taser—and the fact he had previously drawn his Taser on the platform. Also, there was an element of speculation in the defense offer of proof that BART had changed its Taser policy because it had determined defendant had experienced handgun/Taser confusion. For instance, BART could simply have felt that another episode of an officer's criminal negligence possibly could be avoided by changing its Taser policy. Finally, the trial court was well within its discretion to prevent a minitrial on BART's administrative decisions regarding its Taser policy, when the issue was defendant's conduct at the time he shot Grant.

■ We reject defendant's contention he was denied his right to present his defense. Generally, the exclusion of evidence "on a minor or subsidiary point does not interfere with that constitutional right." (*People v. Cunningham* (2001) 25 Cal.4th 926, 999 [108 Cal.Rptr.2d 291, 25 P.3d 519].) Moreover, the record shows that defendant had ample ability and opportunity to present copious evidence, including his own testimony and that of experts, on his defense that he accidentally mistook his handgun for his Taser.

---

[17] In his reply brief, defendant claims that *Lockheed* held only that remedial measures evidence may be admitted in a criminal trial when "a defendant declares that nothing could have been done to avoid the accident." (*Lockheed, supra*, 50 Cal.App.3d at p. Supp. 36.) This language is taken from a discussion of an *exception* to Evidence Code section 1151. (50 Cal.App.3d at p. Supp. 36.) While we admit the *Lockheed* opinion is not necessarily a model of clarity, we need not resolve its precise meaning because of our conclusion under section 352.

## D. *Alleged Instructional Error*

Defendant challenges several instructions given by the trial court, claiming they prejudicially violated his right to due process. We find no prejudicial instructional error.

First, we note the well-established law. Faced with a claim of instructional error, we are obligated to consider whether it was reasonably likely any allegedly erroneous instruction would have led the jury to misapply the law. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 & fn. 4 [116 L.Ed.2d 385, 112 S.Ct. 475].) A challenged instruction is not viewed " 'in artificial isolation,' " but is considered in the context of the instructions as a whole and the entire record. (*Id.* at p. 72.) We are also obligated to regard the jurors as intelligent and capable of understanding and correlating all instructions they are given. (*People v. Mills* (1991) 1 Cal.App.4th 898, 918 [2 Cal.Rptr.2d 614].)[18]

Next, we note, as the record clearly shows, the jury was fully and accurately instructed with unchallenged, correct instructions on involuntary manslaughter. In his rebuttal argument before this court, defendant agreed those instructions were accurate.

Defendant contends the trial court erred by instructing the jury on excessive force, unlawful arrest, and detention. The court gave detailed instructions on these matters. Defendant contends these instructions were unnecessary. But the issues of lawful arrest and excessive force were properly before the jury, given the theory that defendant could have committed misdemeanor manslaughter by using excessive force. Because the evidence is sufficient to establish defendant acted with criminal negligence under the second prong of involuntary manslaughter, on which the jury was properly instructed, we see no prejudicial error.

Defendant complains the instructions somehow made him vicariously responsible for Pirone's admittedly aggressive behavior.[19] He points to language in the instructions that told the jury Pirone's aggressive behavior could be imputed to defendant if he "knew or should have known" that

---

[18] Defendant erroneously argues the "reasonable likelihood" test does not apply when the instruction is "facially incorrect." (See *Middleton v. McNeil* (2004) 541 U.S. 433, 437–438 [158 L.Ed.2d 701, 124 S.Ct. 1830].)

[19] Throughout his briefs, defendant engages in a transparent, red herring attempt to paint Pirone as the "bad actor" here. But we are not a jury. We uphold facts supported by substantial evidence—we do not adjudicate them.

Pirone had acted unlawfully or used excessive force on Oscar Grant. We do not dispute that Pirone was in charge of the scene and defendant was dutybound to obey Pirone's order to arrest Grant. But that is not the controlling point. Without regard to Pirone's conduct, the real question before the jury was whether *defendant acted with criminal negligence by mistaking his handgun for his Taser.* No transfer of blame will answer this question satisfactorily. Rather, the jury made its determination, which we are bound to uphold.[20]

Finally, we reject defendant's contention the jury should have been given a unanimity instruction. No such instruction was required under the factual theories presented because the jury could have differed on the precise factual details of the offense or the applicable theory of criminal liability given possible alternative choices of theories. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1024–1025 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Pride* (1992) 3 Cal.4th 195, 250 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

We find no instructional error to defendant's prejudice.

### E. *Alleged Abuse of Discretion in Denying Probation*

Defendant contends the trial court improperly relied solely on Oscar Grant's death as a reason to deny probation. We disagree because this assertion is not borne out by a fair reading of the entire sentencing record in context.

The matter of sentencing was thoroughly briefed by the parties. The probation report identified several factors in mitigation: defendant was relatively young and had no prior criminal record; he showed remorse and amenability to probation supervision; and he had sufficient ties to the community, steady employment, and stable residency.

Attached to the probation report were several impact statements from members of Oscar Grant's family including his fiancée and mother of his child, and the family's spiritual advisor. The statements described, in what could be considered agonizing detail, the family's severe suffering and emotional distress caused by Grant's death.

The report recommended against a grant of probation: "[T]he loss of the victim's life is immeasurable. The defendant's actions resulted in death and

---

[20] We likewise see no error with the trial court's instructions on sections 148 and 149 since they were core issues for the jury's consideration. We believe that, posttrial, the evidence supports an involuntary manslaughter verdict without regard to excessive force/unlawful arrest issues.

immense suffering for the victim's family and the community. The victims' [*sic*: Grant's family's] lives have been changed forever; thus, the gravity of the offense precludes a recommendation of probation."

Several of Oscar Grant's relatives addressed the trial court, in a manner consistent with the impact statements attached to the probation report. The relatives expressed their profound grief over Grant's death, their distrust of police officers as a result of Grant's killing, and the financial and emotional hardship to now fatherless Tatiana, Grant's young daughter.

The trial court noted the various factors, including the fight on the train, the behavior of the crowd, and the aggressiveness of Officer Pirone, which contributed to the atmosphere of the shooting. The court referred to the eight documented instances of handgun/Taser confusion, and made a statement— which we have already said we find curious—that defendant was not adequately trained on the Taser. The court found defendant credible when he testified he did not intend to shoot Grant. The court also listed several mitigating factors: "[Defendant] is not an aggressive person. No prior record. Good work history. Loving and supportive family. No likelihood of re-offending. I accept all these reasons. . . . [And] I see[] tons of remorse in this case . . . ."

The court, nevertheless, denied probation: "But when I consider sentencing as the probation department has observed, I must remember that a young man needlessly died. I believe prison is appropriate. I believe that the low term in prison is appropriate, and I sentence the defendant to serve the low term of two years in state prison for this tragic event."

A sentencing court enjoys broad discretion in determining whether to grant or deny probation. A defendant who is denied probation bears a heavy burden to show the trial court has abused its discretion. (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120 [43 Cal.Rptr.2d 681, 899 P.2d 67]; *People v. Weaver* (2007) 149 Cal.App.4th 1301, 1311 [58 Cal.Rptr.3d 18] (*Weaver*).) Furthermore, "a denial of probation after consideration of the application on its merits is almost invariably upheld. [Citations.]" (3 Witkin & Epstein, Cal. Criminal Law, *supra*, Punishment, § 532, pp. 718–719.)

A sentencing court must state its reasons for denying probation. (Cal. Rules of Court, rule 4.406; see *People v. Golliver* (1990) 219 Cal.App.3d 1612, 1616–1617 [269 Cal.Rptr. 191] (*Golliver*).) "This obligation to state reasons is satisfied by an explanation of why probation has been rejected in

favor of imprisonment. [Citations.]" (*People v. Leung* (1992) 5 Cal.App.4th 482, 506 [7 Cal.Rptr.2d 290]; see *People v. Romero* (1985) 167 Cal.App.3d 1148, 1151 [213 Cal.Rptr. 774].) For instance, the " 'nature and seriousness of the offense' " is sufficient. (*Golliver, supra,* at pp. 1618–1620.)

Defendant singles out the trial court's reference to "a young man [having] needlessly died," and claims the court denied probation solely due to Grant's death. Defendant relies on the rule stated in *People v. McNiece* (1986) 181 Cal.App.3d 1048 [226 Cal.Rptr. 733],[21] for the proposition that a sentencing court cannot deny probation based solely on facts inseparable from the crime itself, such as the victim's death in a manslaughter case. (*McNiece,* at p. 1060.) The *Golliver* court agreed with that proposition, reasoning that "[t]he death of a victim would not be an appropriate 'circumstance of the crime' on which to choose imprisonment over probation in a manslaughter case because, otherwise, probation would be presumptively unavailable in *all* manslaughter cases—a result clearly not intended by the Legislature." (*Golliver, supra,* 219 Cal.App.3d at p. 1619.)

Defendant contends the trial court relied solely on Grant's death to deny probation. He also suggests the trial court's statement of reasons for denying probation was inadequate. It may be the statement of reasons was not sufficient, since (1) Grant's death alone is not sufficient to deny probation and (2) the trial court's reference to the probation report was also not sufficient. (See *People v. Turner* (1978) 87 Cal.App.3d 244, 247 [150 Cal.Rptr. 807]; 3 Witkin & Epstein, Cal. Criminal Law, *supra,* Punishment, § 280, p. 369.) But any error here would be harmless in the context of the record. (See *People v. Fernandez* (1990) 226 Cal.App.3d 669, 679 [276 Cal.Rptr. 631].)

 The record is clear the trial court considered factors other than Grant's death. The "needlessly died" reference should not be taken out of context. The court considered competing sentencing memoranda and a probation report recommending against probation, in large part based on the emotional impact on Grant's family. Of more significance is the court's consideration of the statements to the court by Grant's relatives, who described the impact of the killing on them, on their attitudes toward police officers, and on the emotional life and financial status of Grant's fatherless young daughter. A sentencing court may consider the emotional and financial impact of the offense on the victim's family in deciding whether to deny probation. (*Weaver, supra,* 149 Cal.App.4th at p. 1317.)

The trial court did not abuse its discretion.

---

[21] Disapproved on unrelated grounds in *People v. McFarland* (1989) 47 Cal.3d 798, 804–805 [254 Cal.Rptr. 331, 765 P.2d 493], and *People v. Flood* (1998) 18 Cal.4th 470, 484, 490, footnote 12 [76 Cal.Rptr.2d 180, 957 P.2d 869].

## III. DISPOSITION

The judgment of conviction is affirmed.

Margulies, J., and Banke, J., concurred.

On July 2, 2012, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied September 12, 2012, S203986.