Filed 1/13/14  P. v. Alvarez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047466 |
| v. | (Super. Ct. No. 10CF2001) |
| RAMON ALVAREZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, William R. Froeberg, Judge.  Affirmed.

Ellen M. Matsumoto, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Barry Carlton, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

In June 1998, the body of Ruben Leal was discovered in the backyard of a house in Santa Ana; Leal had died as a result of a gunshot wound to the head. Fourteen years later, defendant Ramon Alvarez was convicted of Leal's murder, largely on the testimony of Craig Gonzales, a jailhouse informant, who claimed defendant had confessed to Gonzales that he had committed the crime. Defendant appeals from the conviction, claiming Gonzales's history of being an informant in a court case in Nevada was exculpatory evidence the prosecution was obligated to disclose to him, pursuant to *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). Defendant also argues the trial court erred by denying his motion for a new trial because the evidence that Gonzales had previously been an informant would have established he committed perjury during defendant's trial, destroying Gonzales's credibility and resulting in a more favorable result. Finding no merit in defendant's arguments, we affirm.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

About 9:00 a.m. on June 28, 1998, police officers responded to a suspicious circumstances call at 2220 South Halladay Street in Santa Ana; a neighbor had called to report possible gunfire. During a welfare check at the home, the officers found a dead body in an inflatable child's pool in the backyard shed. Ice, a crucifix, and a bag containing the victim's brain were in the pool with the body. The officers also found trash bags nearby, which were full of dirt, blood, brain matter, and grass. Divots in the ground near the shed appeared to have been made by a shovel or pickaxe. Blood spatter and brain matter were everywhere, and flies buzzed around.

A single shell casing from a high-powered assault rifle was found in the backyard. Also located in the backyard were a BMX-type bicycle with metal spikes on the pedals, a pair of size 10 Nike shoes, a bottle of bleach, and a small plastic cup, similar

2

in kind to those used to scoop powdered detergent. The backyard hose was running when the police arrived.

Inside the house, the police officers kicked open a locked bedroom door. Three young men (including Marcos Castaneda, an F-Troop gang member whose moniker was Sleepy, and Raul Beltran, an F-Troop associate) were lying on the bed, and defendant was kneeling in front of one of the beds, as if he were praying; defendant was not wearing shoes or socks.

The victim was identified as Ruben Leal, an F-Troop gang member whose moniker was Oso. Leal had died as a result of a gunshot wound to the right side of his head. Black soot visible on the inner surface of Leal's scalp and a crescent-shaped inward bevel at the entry site indicated the muzzle of the gun was touching or was very close to Leal's head when the shot was fired. It could not be determined whether Leal was standing, kneeling, or lying down when he was shot. No murder weapon was ever found.

The forensic pathologist who conducted Leal's autopsy testified that people who commit suicide with a high-powered rifle normally place the muzzle under their chin, in their mouth, or at their abdomen. The pathologist had never seen anyone kill himself or herself by firing a rifle into the side of his or her head.

When interviewed by the police in June 1998, defendant said he had arrived at the house on South Halladay Street by bicycle 10 to 20 minutes before the police arrived. Defendant claimed that he did not notice anything out of the ordinary, even when he went to the backyard to smoke a cigarette, and that he did not see a dead body. He told the police he had heard Leal's death had been a suicide. Near the end of the interview, defendant refused to "say anything about what happened to the body because he wasn't going to put his life in jeopardy." The shoes found in the backyard were close to defendant's shoe size. The shoes might have been cleaned with detergent and/or bleach; no blood or DNA was found on them.

3

Seven-year-old Jason Luna lived at the house on South Halladay Street with his mother and three sisters. Luna told the police he was sleeping in his bedroom when he heard a gunshot from the backyard. Luna got out of bed and went into the living room; defendant, Castaneda, Luna's mother, and two other women were there. Luna's mother was crying and saying, "oh, my God," and Castaneda was making phone calls, trying to figure out what to do with the body. Luna saw a lot of blood in the bathroom. He saw Castaneda remove some bandage-type material from the bathroom, which Luna assumed Castaneda took to where the body was. Raul Beltran arrived a little while later, and left with one of the women. They returned a few minutes later with three bags of ice; Luna assumed the ice was for the body.

Luna told the police that he had not seen a gun in the house that evening, but that defendant kept an assault-type rifle in the house for protection against rival gang members. Luna said he believed defendant was his mother's boyfriend. At trial, which occurred 14 years after the shooting, Luna claimed he did not know who defendant was and he could not remember the events surrounding the shooting. Shortly before trial, Luna told investigators that he had told the truth to the police when he was seven years old.

To avoid compromising the investigation, the police did not release all the details of the crime to the public. The press release revealed that the body was found in a pool with ice. The press release did not mention the type of weapon used, that the victim was shot in the head, that the murder weapon had not been found, or that brain matter was packed in bags.

In January 1998, Craig Gonzales shared a cell with defendant at Chino state prison for about a week. Several months later, in late June 1998, Gonzales and defendant were again briefly housed together at the Santa Ana jail. Gonzales testified that while in the Santa Ana jail, defendant told Gonzales he was in jail for a murder that happened at his girlfriend's house. Defendant said the victim was someone he knew, who "wasn't

4

supposed to be there and he knew better." Defendant told Gonzales he had shot the victim in the head with an AK-47 rifle, then put the body in a shed with ice on it to keep it from smelling. He said the shot blew out the victim's brain, and he had had to pick up the pieces of brain matter, which he placed in bags; the bags were put with the body. Defendant also said he had to get the tissue and blood that had soaked into the dirt. He told Gonzales "they" had talked about saying the victim had shot himself. ("They" referred to defendant and a female, whose name defendant did not share with Gonzales.) Defendant said the gun used in the shooting would never be found, based on where they got rid of it.

F-Troop was a criminal street gang on June 28, 1998. A gang expert testified that F-Troop is one of the oldest, largest, and most violent gangs in Orange County. Both defendant and Leal were F-Troop members. In 1998, Luna's mother's house was well known as an F-Troop house, at which F-Troop members congregated. The gang expert testified that he had investigated gang-related shootings at that house on more than one occasion.

The gang expert testified that guns are a gang's "bread and butter." Gang members use guns to commit crimes, and use them offensively and defensively against rival gang members. Gang members refer to all assault rifles as "AK's." It is common for gang members to get rid of "hot" or "burned" guns, meaning those guns that have been used to kill and for which the police are searching.

The gang expert also testified that respect is a key concept in gang culture because respect equals fear. Gangs believe they earn respect by inciting fear due to their level of violence. Disrespect must be answered with an act of retaliation. While it is not common for a gang member to kill a member of his own gang, it can happen in retaliation for an act of disrespect. The killing of Leal would benefit his own gang, F-Troop, by sending a message to the community that the gang would even kill one of its own

members who stepped out of line, increasing the gang's reputation for violence, and theoretically bringing them more respect in the community.

In defense, Karina Lopez, Leal's girlfriend, testified that the night he was killed, Leal had gone to a party with Castaneda and two females. Leal later called Lopez and asked her to bring his shoes to the house on South Halladay Street. When she arrived, Lopez took the shoes to the shed in the backyard, where Leal was. As Lopez was trying to leave, Leal grabbed her by the hair, and began hitting and punching her. Lopez had never seen Leal act that way, and thought he might be on drugs. Lopez left to go home about 2:00 a.m.

Sylvia Beltran, who lived at the South Halladay Street house and was defendant's cousin, woke up when she heard Lopez's calls for help. Sylvia Beltran saw Leal beating Lopez, and testified Leal was "all drugged" up. Sylvia Beltran separated Leal from Lopez, and tried to calm Leal down. After 1:00 a.m., Sylvia Beltran went back to sleep on the sofa in the living room. Sometime between 3:00 and 4:00 a.m., she woke up to the sound of a gunshot. She saw Leal lying in the backyard, not moving. Luna's mother and another woman at the house, Josie, told Sylvia Beltran that Leal had hit Josie in the mouth. Luna's mother refused to call the police because she did not want to lose her house. Sylvia Beltran called her brother Raul Beltran, and also called defendant. Raul Beltran showed up about 6:00 a.m., and defendant showed up between 8:30 and 9:00 a.m. Sylvia Beltran testified defendant was not at the house when Leal was shot.

Defendant was charged with murder (Pen. Code, § 187, subd. (a)), with sentencing enhancement allegations that he personally used a firearm (*id.*, § 12022.5, subd. (a)), and that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang (*id.*, § 186.22, subd. (b)(1)).[1] A jury convicted

---

[1] Defendant was originally charged with an additional count of street terrorism. (Pen. Code, § 186.22, subd. (a).) That count was dismissed on the People's motion because it was filed after the statute of limitations had run.

defendant of second degree murder, and found the sentencing enhancement allegations to be true. Defendant filed a motion for a new trial based on newly discovered evidence; the trial court denied the motion. Defendant was sentenced to 15 years to life in state prison on the murder charge, plus a consecutive sentence of 10 years for the firearm enhancement. Because of the true finding on the gang enhancement, defendant was ordered to serve a minimum of 15 years. Defendant timely appealed.

DISCUSSION

I.

*THE PROSECUTION DID NOT HAVE EXCULPATORY EVIDENCE IN ITS POSSESSION, AND, THEREFORE, COULD NOT HAVE VIOLATED BRADY.*

Defendant contends that the prosecution's failure to disclose evidence of Gonzales's prior history of being an informant was *Brady* error in violation of his right to due process under the Fourteenth Amendment to the United States Constitution.[2] We apply an independent standard of review. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042.)[3]

"'The federal due process clause prohibits the prosecution from suppressing evidence materially favorable to the accused. The duty of disclosure exists regardless of good or bad faith, and regardless of whether the defense has requested the materials.

---

[2] Defendant does not separately argue any violation of Penal Code section 1054.1, subdivision (e), which provides: "The prosecuting attorney shall disclose to the defendant or his or her attorney all of the following materials and information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies: [¶] . . . [¶] . . . Any exculpatory evidence."

[3] Defendant did not specifically argue in the trial court that there was a violation of *Brady* when he moved for a new trial. The Attorney General, however, does not contend defendant forfeited the issue. A claim that the prosecution violated *Brady* may be raised for the first time on appeal, if it presents a pure question of law to be determined based on undisputed facts. (*People v. Gutierrez* (2003) 112 Cal.App.4th 1463, 1471, fn. 5.)

[Citations.] The obligation is not limited to evidence the prosecutor's office itself actually knows of or possesses, but includes "evidence known to the others acting on the government's behalf in the case, including the police." [Citation.] [¶] For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness. [Citations.] Evidence is material if there is a reasonable probability its disclosure would have altered the trial result. [Citation.] Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies. [Citations.] Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not satisfied is reversible without need for further harmless-error review. [Citation.]' [Citation.]" (*People v. Whalen* (2013) 56 Cal.4th 1, 64.)

"A prosecutor's duty under *Brady* to disclose material exculpatory evidence extends to evidence the prosecutor—or the prosecution team—knowingly possesses or has the right to possess. The prosecution team includes both investigative and prosecutorial agencies and personnel. [Citation.] . . . [A] prosecutor has a duty to learn of favorable evidence known to other prosecutorial and investigative agencies acting on the prosecution's behalf, including police agencies. The scope of the prosecutorial duty to disclose encompasses exculpatory evidence possessed by investigative agencies to which the prosecutor has reasonable access. [Citation.] [¶] A prosecutor has a duty to search for and disclose exculpatory evidence if the evidence is possessed by a person or agency that has been used by the prosecutor or the investigating agency to assist the prosecution or the investigating agency in its work. The important determinant is whether the person or agency has been 'acting on the government's behalf' [citation] or 'assisting the government's case.' [Citation.] [¶] Conversely, a prosecutor does not have a duty to disclose exculpatory evidence or information to a defendant unless the prosecution team actually or constructively possesses that evidence or information. Thus, information possessed by an agency that has no connection to the investigation or prosecution of the

8

criminal charge against the defendant is not possessed by the prosecution team, and the prosecutor does not have the duty to search for or to disclose such material." (*People v. Superior Court (Barrett)* (2000) 80 Cal.App.4th 1305, 1314-1315.) "The prosecution has no general duty to seek out information from other agencies or sources that might be beneficial to the defense, except for information that is reasonably accessible to the prosecution and not to the defendant. [Citation.]" (*Id.* at pp. 1318-1319.)

This case turns on whether the information regarding Gonzales's previous experience as an informant in Nevada was within the constructive possession of the prosecution in this case. In response to defendant's pretrial request for discovery, the Orange County District Attorney's Office provided an information report reading, in relevant part, as follows: "On October 5, 2010, District Attorney Investigator John Kenney checked law enforcement resources to determine if Craig Gonzales had a background as an informant in California and other states there was none [*sic*]. [¶] Craig Gonzales has no history as an informant in Orange County per the Orange County District Attorney's Office." (Some capitalization omitted.)

In the motion for a new trial, defendant's trial counsel detailed the rather tortuous process by which he finally obtained the information regarding Gonzales's participation as an informant in a Nevada state court proceeding. The declaration in support of the motion for a new trial included reference to the unsuccessful search performed by a private investigator hired by defendant's trial counsel, as well as the Sacramento County Sheriff's Department's statement that it had no documents responsive to a subpoena seeking information on Gonzales as an informant. When defendant's trial counsel's office reviewed the hearing history of each case in Gonzales's lengthy history, it discovered a motion that had been decided on the same day as Gonzales was sentenced in one case. Defendant's trial counsel's office then asked the Sacramento County Superior Court clerk's office to retrieve the documents relating to that hearing from storage. After the files were retrieved from storage, an attorney copy

9

service obtained Gonzales's motion pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, and the opposition thereto.[4] In the opposition brief, the following information appears: "The Probation Department recommended a sentence of 2 years state prison for the defendant [(Gonzales) on charges of violating Penal Code sections 502, subdivision (c), and 530.5, to which Gonzales pled guilty]. Before judgment and sentence, [Gonzales] was released to Nevada state court. [Gonzales] went to law enforcement with information on a sexual assault and testified at trial for prosecution in Nevada. [Gonzales] received [a] favorable letter from Nevada prosecutor."[5]

On appeal, defendant argues that the prosecution had access to and searched "their all-state database for informant evidence." Defendant fails to provide this court with any evidence that such an all-inclusive database exists, or that it would have provided the information defendant sought. The key information here was buried in the middle of an opposition to a *People v. Superior Court (Romero)* motion; it does not provide a definitive statement as to Gonzales's status as a jailhouse informant or "snitch," and the opposition brief was not identified by the Sacramento County Sheriff's Department as responsive to defendant's subpoena. All of these facts are evidence that even if an all-state database exists, it might not be able to provide the information sought.

None of the cases defendant cites on appeal requires that the prosecution, in order to fulfill its obligations under *Brady*, seek or confirm information from any resource other than those actively involved in the current prosecution. (See *Kyles v. Whitley* (1995) 514 U.S. 419, 437 ["the individual prosecutor has a duty to learn of any

---

[4] *People v. Superior Court (Romero), supra,* 13 Cal.4th at page 530, provides that a trial court may strike a defendant's strike priors for sentencing purposes in furtherance of justice.

[5] Defendant admits nothing in the record establishes conclusively that Gonzales was testifying based on another inmate's jailhouse confession to him in the Nevada state case.

favorable evidence known to the others acting on the government's behalf in the case, including the police"]; *In re Brown* (1998) 17 Cal.4th 873, 879 ["any favorable evidence known to the others acting on the government's behalf is imputed to the prosecution"].) "[T]he prosecution 'has no *general duty* to seek out, obtain, and disclose all evidence that might be beneficial to the defense.' [Citation.]" (*People v. Panah* (2005) 35 Cal.4th 395, 460.)

Based on our independent review of the record, we conclude the information about Gonzales's testimony in the Nevada case was not subject to disclosure by the prosecution under *Brady*. The Sacramento County Sheriff's Department was not working on behalf of the Orange County District Attorney's Office in this case. The prosecution had no duty to seek out or obtain the evidence of Gonzales's testimony in the Nevada case. Therefore, defendant's due process rights were not violated because of an alleged failure to provide information regarding Gonzales's previous experience as an informant.

If the prosecution had failed to turn over exculpatory evidence in its possession (actual or constructive), we would next determine whether the information that was withheld was material. Exculpatory evidence is material if there is a reasonable probability that, had it been disclosed to the defense, the result at trial would have been different. (*In re Miranda* (2008) 43 Cal.4th 541, 575.) Defendant claims that evidence of Gonzales being an informant in Nevada would have allowed defendant to attack Gonzales's credibility by showing (1) Gonzales had perjured himself when he testified he had not previously been an informant; (2) he was an experienced, professional government informant; and (3) he had a motive to lie to obtain favorable treatment from the government. As discussed in more detail, *post*, the jury heard evidence regarding Gonzales's lengthy criminal history (which included theft and fraud-related crimes), and evidence from which any reasonable juror would infer that Gonzales had, despite his protestations to the contrary, previously been a government informant in Fort Worth,

11

Texas. In light of this record, it is not reasonably probable that evidence Gonzales also had been an informant in Nevada would have changed the result in this case.

II.

*THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE.*

"A trial court may grant a new trial motion '[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial.' ([Pen. Code,] § 1181, subd. (8).) In ruling on such a motion, the trial court considers several factors: ""'1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits.'" [Citations.]' [Citation.]" (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1151.) "A new trial motion based on newly discovered evidence is looked upon with disfavor. We will only disturb a trial court's denial of such a motion if there is a clear showing of a manifest and unmistakable abuse of discretion. [Citations.]" (*Ibid.*)[6]

Defendant contends that the evidence of Gonzales's previous experience as an informant would have proven Gonzales committed perjury at defendant's trial. The trial court found the evidence would not have proven any perjury on the part of Gonzales. Gonzales testified as follows, when questioned by defendant's trial counsel:

---

[6] Defendant's motion for a new trial was based on the lack of sufficient evidence to support the conviction, as well as two items of newly discovered evidence—the evidence of Gonzales's previous experience as an informant and evidence of an audio recording of the police interview of Luna the day after the shooting, which defendant argued was inconsistent with the summary of the interview included in contemporaneous police reports. On appeal, defendant pursues his argument only as to Gonzales's role as an informant in the Nevada case.

12

"Q . . . Mr. Gonzales, have you ever testified for the district attorney's office before?

"A No.

"Q Are you telling us that this is the first time you've ever testified for the district attorney?

"A Here, yes.

"Q You've never been an informant before?

"A Are you talking about here? No.

"Q Anyplace, Sacramento, Fort Worth.

"A No, either place.

"Q You turned in some Black Guards that said they were going to make a break out of prison, right?

"A No.

"Q You didn't do that?

"A It wasn't Black Guards.

"Q What were they?

"A And it wasn't with any court. It was just in the prison while I was at Fort Worth, there were two inmates that were getting ready to go back to San Diego and they had an escape plan. They were gonna kill both guards that took them.

"Q So you snitched on them?

"A I told them what was going on.

"Q You were an informant then?

"A If that's what you want to call it. If that's what you want to call it.

"Q What do you call it?

"A Saving their lives.

"Q By snitching?

"A Okay."

13

We agree with the trial court that Gonzales did not commit perjury in his testimony regarding his history as an informant.  Gonzales was clearly being evasive in his responses to defendant's counsel's questions, but that does not necessarily equate to perjury.

The evidence regarding Gonzales's previous experience as an informant would not have been material, in any event.  The following testimony was provided by Gonzales regarding his criminal history:

"Q  How long have you been presently incarcerated right now?

"A  Since 2003.

"Q  And you're serving a sentence.  How long of a sentence is that?

"A  19 years, eight months.

"Q  And when were you sentenced to that particular time?

"A  February, 2008.

"Q  And what was that for?

"A  It was for possession of narcotics, possession for sales, forgery—a couple counts of forgery, fraud, and bad checks.

"Q  And there must have been some sentencing enhancements on top of that to get all the way up to that 19-year range.

"A  Right.  Because I had prior dope cases, drug cases and got three-year enhancements for each one plus a prior strike that I had from 1989.  [¶] . . . [¶]

"Q  You have been in and out of custody most of your adult life, is that a fair statement?

"A  Yes.  Almost all of my adult life.

"Q  Share with us some of the types of other crimes that you've been convicted [of committing] over the years.

"A  In 1989 I was convicted of unarmed bank robbery.  I've been convicted of drug cases, identity theft, second-degree burglary, forgery, and I think that's about it.

14

"Q  In your adult life how much time do you think you've spent out of custody?

"A  Well, since 1989 I've . . . spent about two-and-a-half years.

"Q  Out of custody?

"A  Out of custody."

Given the evidence of Gonzales's informing in Fort Worth and his criminal history, including many theft and fraud-related crimes, it is not reasonably probable that the jury's verdict would have been different if evidence that Gonzales had been an informant in the Nevada case had been offered.  The trial court did not err in denying the motion for a new trial.


DISPOSITION

The judgment is affirmed.



FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


ARONSON, J.


15