Filed 4/30/14  P. v. Hegazy CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>ADEL KAMAL HEGAZY,<br><br>　　　Defendant and Appellant. | H039284<br>(Monterey County<br>Super. Ct. No. SS120359) |

An ambulance and several volunteer firefighters responded to a report of a vehicle accident on a remote stretch of Highway 1 in Monterey County, where they encountered defendant Adel Kamal Hegazy standing on a dirt turnout near his damaged vehicle. Hegazy, who was not obviously injured, initially ignored the responding firefighters and refused their attempts to examine him.  When two firefighters went to check his vehicle, Hegazy became enraged and grabbed a metal wheel chock that firefighters had placed behind the tire of his car to prevent it from rolling or being moved.  Hegazy began swinging the metal chock around, screaming that he wanted the police.  He hit one firefighter in the arm and another on the helmet with the chock before a California Highway Patrol (CHP) officer arrived.  Hegazy had to be tased three times before he could be taken into custody and transported to the hospital.

A jury convicted Hegazy of three counts of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1))[1] and one count of resisting a peace officer (§ 148, subd. (a)(1)).

---

[1] Further unspecified statutory references are to the Penal Code.

The jury found him not guilty of several other charges and could not reach a verdict on two other counts. The court declared a mistrial on the latter two charges.

The trial court denied probation and sentenced Hegazy to a total term of two years in prison, consisting of the lower term of two years on the first count of assault with a deadly weapon, and concurrent two year terms on the other two counts of assault with a deadly weapon. He was sentenced to 365 days in county jail on the charge of resisting a peace officer, with 365 days credit.

On appeal, Hegazy argues the trial court abused its discretion in denying probation. According to Hegazy, the trial court erroneously stated he had an "insignificant" criminal history, when he actually had no criminal record. There was also no support for the trial court's findings that he lacked remorse or that the version of events he gave to the probation department was different than the version he presented at trial. The trial court also disregarded a pretrial psychiatric evaluation, conducted pursuant to section 1368, which indicated Hegazy had suffered a psychotic episode during the incident.

We reject Hegazy's arguments and will affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *The charges*

Hegazy was charged by information with four counts of assault with a deadly weapon (§ 245, subd. (a)(1), counts 1, 2, 9, 10), two counts of vandalism causing more than $400 in damage (§ 594, subd. (b)(1), counts 7, 11), driving under the influence (Veh. Code, § 23152, subd. (a), count 4), being under the influence of a controlled substance (Health & Saf. Code, § 11550, subd. (a), count 5), resisting a peace officer (§ 148, subd. (a)(1), count 6), and two counts of battery causing injury to emergency personnel (§ 243, subd. (c)(1), counts 3, 8). In connection with the assault with a deadly weapon and battery causing injury to emergency personnel counts, the information further alleged that

2

Hegazy personally used a deadly weapon, specifically a wheel chock. (§§ 667, 1192.7, 12022, subd. (b)(1).)

B.      *The prosecution's case*

1.      *The vehicle accident and emergency response*

On the evening of February 24, 2012, Big Sur volunteer firefighters and an ambulance responded to a report of a vehicle accident on Highway 1. When they arrived on the scene, they found a vehicle parked on a dirt turnout on the west side of the highway. The vehicle's front and rear bumpers were damaged, and one of the headlights was broken. The vehicle's engine was off, but the keys were in the ignition and "Middle Eastern chanting-type music"[2] was playing loudly on the car speakers.

Hegazy and two other people, one male, the other female,[3] were standing on the turnout. Hegazy and the other man were standing "nose to nose, probably one foot apart," engaged in a "stare-off," which lasted for 15 to 20 minutes.

Emergency medical technicians (EMT) and firefighters tried to talk to Hegazy and see if he was injured or needed assistance in any way. Hegazy would not break off eye contact with the other man, instead holding out his hand and saying, "No." He said he "wanted 9-1-1," but when a firefighter responded, "We are 9-1-1," Hegazy said he wanted "police, not fire."

Nimmo and another firefighter examined Hegazy's car to look for signs he had been injured in the accident, such as a broken windshield. The windshield was intact, and the airbags had not deployed. When one of the firefighters reached to remove the key from the ignition, Hegazy became "very angry," broke off the stare down, and approached them. Hegazy yelled at the firefighters, violently pushed them away from his

---

[2] One of the firefighters, Christian Nimmo, later asked Hegazy to turn off the music. Hegazy became upset and said it was prayers, not music.

[3] According to one of the responding firefighters, the woman worked at the nearby Esalen Institute. The man engaged apparently left the scene without being identified.

car and told them they should not be near his vehicle. He got into the car and tried unsuccessfully to start it. At some point, however, a firefighter had placed a metal wheel chock behind one of the rear wheels to prevent the car from rolling, and to stop Hegazy from driving a potentially damaged vehicle.

Hegazy became angry, got out of his car and pulled the chock out from behind his wheel. Holding it in both hands, he swung it at Nimmo, hitting him in the arm.[4] He continued swinging the chock, shouting "get back," and "I want 9-1-1. I want the police." The firefighters moved away from Hegazy, and as they retreated, Hegazy occasionally paused to squat and yell while slamming the chock in the dirt. He would then rise and come towards the firefighters again, some of whom were radioing for police assistance. One firefighter testified Hegazy smiled as he came towards them swinging the chock, and appeared to be "getting pleasure out of what he was doing, taunting us."

Some of the emergency personnel moved behind the fire engine and ambulance. Hegazy followed them, still yelling and swinging the chock, which struck the fire engine, breaking some of its lights. Hegazy, with a smile on his face, came at Firefighter James Betts, M.D. Hegazy swung the chock at his head, but Betts was able to deflect Hegazy's arm so the chock hit the side of his helmet, gouging it and dazing him. The chock ricocheted up and over Hegazy's head, striking him in the back of the head. Still holding the chock, Hegazy withdrew a little and began pacing along the shoulder of the highway.

CHP Officer Eric Dutra arrived at the scene a short time later and was advised by a firefighter that Hegazy had attacked them. Drawing his taser, Dutra ordered Hegazy to drop the chock. Hegazy ignored the command, continuing to pace while staring at Dutra. Dutra repeated the command several times until Hegazy, still staring at Dutra and mumbling unintelligibly eventually complied. Dutra then ordered Hegazy to sit on the

---

[4] Nimmo's arm was bruised, but no bones were broken.

4

ground. Hegazy instead dropped to his knees and started to gather small rocks in his hands. Dutra ordered him to drop the rocks. Hegazy screamed "Ala [*sic*]," and began to get up. Dutra believed Hegazy was preparing to attack him, so Dutra tased him. After the five-second taser cycle ended, Hegazy again screamed "Ala [*sic*]" and tried to get up, so Dutra tasered him again. Dutra tasered Hegazy a total of three times before Hegazy finally complied and rolled over onto his stomach. Hegazy was handcuffed and placed in the ambulance, where EMTs treated a gash on the back of his head. Before the ambulance left for a nearby hospital, Dutra overheard Hegazy stating several times he was confused and was sorry.

### 2. *Hegazy's treatment and evaluation at the hospital*

Dutra followed the ambulance to the hospital and, after advising Hegazy of his *Miranda*[5] rights, interviewed him in the emergency room. Hegazy told Dutra he had borrowed the car earlier that day, and had also smoked "ice," which Dutra recognized as a street term for crystalline methamphetamine.

Hegazy told Dutra when he left San Jose he "didn't know where he had been going," and when he got to Big Sur he "didn't even [k]now how he had gotten there." Both at the scene of his initial contact with Hegazy and at the hospital, Dutra observed that Hegazy "exhibited [an] inability to stay focused, rapid speech on scene, foaming at the mouth in the corners, [and] rapid eye movement." Dutra called for another officer to evaluate Hegazy for being under the influence.

CHP Officer Matthew Babcock, a trained "Drug Recognition Evaluator," testified he was called to the hospital to determine if Hegazy was under the influence of one or more controlled substances. Babcock observed Hegazy's hands and feet twitching involuntarily and he was grinding his teeth. Hegazy's pupils were dilated and did not respond normally to light. Using a light to examine inside Hegazy's nose, Babcock

---

[5] *Miranda v. Arizona* (1966) 384 U.S. 436.

5

noticed Hegazy's septum was worn on one side, which is a sign of prolonged drug use. Furthermore, Hegazy's mouth was extremely dry and his tongue appeared cracked. He had a white substance on his lips.

Babcock asked Hegazy a standard series of questions, e.g., what he had eaten and drunk during the day, whether he was diabetic or had high blood pressure, etc. Hegazy would often not answer or "would go from looking at me, appearing to be following what I was saying, to looking off in the distance and mumbling, or just stating incoherent statements." When asked if he was taking medications or drugs, Hegazy said he was taking "Ice." Babcock clarified that Hegazy was referring to methamphetamine. Based on his evaluation, Babcock formed the opinion Hegazy was impaired by a central nervous system stimulant, a category of drugs which include methamphetamines.

Hegazy initially refused to have his blood drawn by a female phlebotomist, saying it was "against his religion," so a male phlebotomist was called in to take a blood sample. The phlebotomist had difficulty obtaining the sample because Hegazy would not cooperate, pulling his arm away and laughing every time the needle approached. The officer told Hegazy that it would be automatically considered a positive result if they could not obtain a blood sample and Hegazy finally cooperated. Hegazy's blood tested positive for amphetamines, the pharmaceutical family containing methamphetamine.[6]

### 3. *Hegazy's transportation to jail*

Once Hegazy was cleared to leave the hospital, Dutra and another officer began to escort Hegazy to Dutra's patrol vehicle. Hegazy asked where they were going and Dutra explained they were taking him to jail. Hegazy immediately went limp, forcing the

---

[6] CHP Officer David Veliz conducted an inventory search of the vehicle before it was towed, but found no weapons, drugs or drug paraphernalia inside the car. Veliz also testified, based on his reconstruction of the accident, Hegazy was driving southbound on Highway 1 when he lost control of the car approaching a curve and collided with the guardrail.

officers to carry him to the car. Dutra's car did not have a partition between the front and back seats, so he placed Hegazy, still handcuffed, in the front seat and used a nylon strap to secure the handcuffs to the floorboard. Dutra drove the vehicle and the other officer sat in the back seat. As they were driving, Hegazy began hitting the passenger door with his right leg. Dutra told him to stop, but Hegazy lifted his legs and kicked the windshield, shattering it. Dutra pulled the car over and the two officers restrained Hegazy's legs and secured his legs to the handcuffs. They placed him in the back seat, and drove him to jail without further incident.

Throughout his encounters with firefighters, highway patrol officers and medical personnel that evening, Hegazy appeared to have no problems speaking or understanding English.

### C.    *The defense case*

Hegazy testified on his own behalf, through an interpreter. At the time of trial, Hegazy was 28 years old, married, and had lived in the United States for over two years.[7] His first language was Arabic, though he claimed he understood "some" English, and he has a bachelor's degree in social science.

Hegazy, who lived in San Jose, said he was driving his wife's car around San Jose on the evening of February 24, 2012, to familiarize himself with the area. He started driving about 5:00 p.m. and after driving for about three hours, he realized he was lost. His phone had died, and he was trying to find the nearest town to ask how to get back to San Jose.

As he was driving, some people in another car behind him were driving extremely close to him. The car had tinted windows, so he could not see who was inside. Since July of 2011, Hegazy believed agents of the Israeli government were harassing him, and he was afraid the people in this car were involved in that harassment. With the car

---

[7] The probation report indicates Hegazy was born in Egypt.

behind him coming dangerously close, Hegazy lost control of his car as he tried to negotiate a curve, hit the guardrail and hit his head against the car door.  Feeling dazed, he pulled over on the side of the road to check the condition of his car.

Other people stopped and offered assistance, but then Hegazy saw a man get out of the car that had been driving behind him.  The man came up to Hegazy and stood about six to seven inches away to intimidate him.  When Hegazy would move away, the man would advance and "invade" Hegazy's space.  Hegazy asked the other people to call the police immediately, and someone said the police were on their way.

Hegazy was surprised when a fire engine arrived on the scene rather than police officers, so he told them that he needed the police.  He asked the firefighter to tell everyone to stay away from him and his car.  Because of all the people and cars that had arrived, Hegazy began to get suspicious that the firefighters were conspiring with the man who was trying to intimidate him and would steal his car.

One of the firefighters said "We are here to help you," and at that same moment, the other man moved closer to Hegazy, still staring at him.  One of the firefighters pushed him on the shoulder, and Hegazy pushed his arm away.

Hegazy then discovered the metal chock behind his wheel, though he had not seen anyone put it there.  He did not know why it was there, so he grabbed it in order to throw it away from his car.  The staring man kept getting closer, so Hegazy used the chock to keep him, as well as the firefighters he thought were conspiring with the staring man, away.  He swung the chock only to get everyone to move away, not because he intended to hit anyone.  Hegazy denied chasing anyone, swinging the chock at or hitting anyone with it, though he admitted he accidentally hit the fire engine once as he was swinging it.

When the officer arrived, Hegazy could not understand him at first because he was far away.  When he heard the officer tell him to drop the chock, he did so.  When the officer asked him to sit on the ground, he did so.  The officer again said something Hegazy did not understand, immediately tased him and then tased him again.  Hegazy fell

8

backwards hitting his head on the ground each time he was tased. The officer put him in handcuffs and placed him in the ambulance, which transported him to the hospital.

At the hospital, Hegazy allowed them to take a blood sample. He could not really understand what people were saying, so he told the officer that he needed an Arabic interpreter. When Babcock was asking him questions, Hegazy said he could not understand some of the things he said and he did not respond. Hegazy admitted he had previously smoked methamphetamine once or twice, but he had not taken any drugs the day of the accident. However, he denied telling any of the officers he had smoked methamphetamine that day.

When the officers took him to the patrol car, Hegazy was in a lot of pain and he had no strength in his leg from the tasings, so he could not walk. When they told him he was being taken to jail, he was too afraid to object and he did not resist being taken to the car. He denied kicking the windshield of the patrol car.

### D. *The verdict and sentencing*

The jury convicted Hegazy of resisting a peace officer (count 6), and three counts of assault with a deadly weapon (counts 1, 2, 10). The jury found him not guilty on the vandalism charges (counts 7, 11), battery on emergency personnel (counts 3, 8) and one charge of assault with a deadly weapon (count 9). The jury said it could not agree on a verdict on the driving under the influence and being under the influence charges (counts 4, 5), and the court declared a mistrial on those counts.

At sentencing, after reviewing the probation report, hearing a statement from Hegazy as well as arguments from counsel, the trial court denied probation and sentenced Hegazy to the lower term of two years on count 1, with concurrent two year terms on counts 2 and 10, as well as 365 days in county jail on count 6 with credit for 365 days. With respect to his prison term, he was awarded a total of 409 days of credits, consisting of 205 days of custody credits plus 204 days of conduct credits.

9

## II. DISCUSSION

Hegazy argues that the trial court's denial of probation constituted an abuse of discretion. He contends the decision was based on erroneous factual assumptions, as well as a failure to recognize Hegazy's amenability to mental health treatment. We disagree, and find the trial court's decision was not arbitrary, capricious or beyond the bounds of reason.

### A. *Background*

Following Hegazy's conviction, the trial court referred the matter to probation for a presentence report. The probation officer interviewed Hegazy with the aid of an interpreter.

In the interview with the probation officer, Hegazy said he was 28 years old, was born in Egypt and moved to the United States three years prior to the incident. Hegazy said he was going sightseeing on February 24, 2012, but the battery on his global positioning device died and he became lost. While driving through Big Sur, he hit a curb, and pulled over about a mile later. Another vehicle stopped, but instead of helping, the person "stared him down." Hegazy was confused when firefighters arrived instead of the police, and he could not understand why they tried to get in his car. Hegazy said, in Egypt, "emergency personnel are never helpful, as they are corrupt and not to be trusted." He picked up the wheel chock to protect himself, but denied he hit anyone with it.

When the CHP officer arrived, he dropped the chock as instructed but could not understand why the officer wanted him to sit down. He was tased and tased again only a few seconds later, and when he fell to the ground, he cut his head. He denied picking up any rocks or using drugs that night. Since he had experimented with methamphetamines previously, he told the officer he had used "ice" when asked about drugs, but he did not mean he had used it that day. Hegazy also denied kicking out the windshield of the patrol car. In his opinion, the case was a "conspiracy between fire personnel and the police."

10

In the report, the probation officer noted that Hegazy was cooperative and "appeared to understand the questions asked of him and frequently responded, in English, ahead of the interpreter, leaving the undersigned to ponder why he would not cooperate with emergency personnel who had attempted to assist him." Because Hegazy "was not found guilty[8] of driving under the influence of a controlled substance, his erratic and extremely assaultive behavior can only be attributed to [his] self-admitted distrust of public authorities."

The probation officer listed the following factors in aggravation: (1) the crime involved the threat of great bodily harm (Cal. Rules of Court, rule 4.421(a)(1)); (2) Hegazy was armed with a metal wheel chock (*id.*, (a)(2)); and (3) Hegazy "engaged in violent conduct that indicates a serious danger to society." (*Id.*, (b)(1).) The only mitigating factor noted was that Hegazy "has no prior record, or has an insignificant record of criminal conduct." In conclusion, the probation officer recommended the trial court impose a three-year suspended sentence and place Hegazy on formal probation.

At the sentencing hearing, the trial court announced it was tentatively inclined to deny probation, stating: "The defendant was convicted by jury of three strike offenses, felonies, and probation doesn't seem to address the--well, I guess what I'm questioning . . . is the defendant amenable to a grant of probation? [¶] Quite frankly, I see no acceptance of responsibility, no comment that he understands that he did wrong, that he violated the law. [¶] And it seems to me that [this] is not the proper mind set for someone who is going to be successful on probation. We may be thinking about a prison term which would be more amenable to his particular mind set."

---

[8] Actually, the jury was unable to reach a verdict on the charges of driving under the influence and being under the influence of a controlled substance. After the court declared a mistrial on those counts, the People elected not to retry Hegazy.

11

Hegazy asked for an opportunity to address the court, and before he did so, the court told him: "I know you heard what I said initially. I have yet to get a straight answer on what happened. You elected to testify. You give a completely different statement to probation. You testified that you got lost in San Jose, ended up down in Big Sur. You tell probation you decided to go sightseeing in Monterey. That's simply not what you testified to. [¶] You tell probation you hit a curb. You went into lengthy explanations on how you were being followed for a long period of time by Israelis and that's what caused this accident down in Big Sur. [¶] I just can't understand where you're coming from and whether or not you actually believe that you did anything wrong. [¶] So you can say anything you'd like to say, but you might want to direct your comments to that."

Hegazy, through an interpreter, addressed the court. He denied that the version of events he gave to the probation officer was different from the version he presented in court, explaining that it was perhaps a problem with the translation provided at the probation interview. Hegazy also expressed remorse for the incident, saying "[t]he reason behind this whole ordeal was my lack of understanding. First of all, my lack of understanding of the American system. It is very different from the system I am used to in Egypt. And also my lack of understanding of the English language. There was definitely a miscommunication in that regard." He specifically denied having any animosity towards firefighters or other emergency responders.

Defense counsel argued in favor of a grant of probation, citing both Hegazy's youth and lack of a prior criminal record as mitigating factors. In addition, counsel noted that, although "it didn't amount to a defense[,] . . . there may have been other contributing factors to [Hegazy's] mental state on the day in question."

Proceeding to sentencing, the trial court found there were no factors in aggravation, but Hegazy's "insignificant [criminal] record" was a mitigating factor. Consequently, the court selected the lower term of two years on each of the three counts

of assault with a deadly weapon. The trial court denied probation without further explanation, apparently as its initial concerns about Hegazy's "mind set" had not been adequately addressed at the hearing.

### B.     Standard of review

The grant or denial of probation is within the trial court's discretion. (*People v. Weaver* (2007) 149 Cal.App.4th 1301, 1311.) The reviewing court must determine whether the trial court's order " 'is arbitrary or capricious or exceeds the bounds of reason considering all the facts and circumstances.' " (*Ibid.*) Accordingly, " 'a denial of probation after consideration of the application of its merits is almost invariably upheld.' " (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1157.)

### C.     The trial court did not abuse its discretion in denying probation

Hegazy claims the trial court's reasons for denying probation were erroneous or not supported by the record. We examine each of these purported inaccuracies in turn.

First, Hegazy asserts the trial court incorrectly said he had an insignificant criminal record, rather than no criminal record. While this is true, the trial court's mistake is both minor and irrelevant. There is nothing in the record to suggest that the trial court considered Hegazy's criminal record (or lack thereof) as a factor in deciding whether to grant probation. Instead, the trial court appears to have been using this factor solely in deciding whether to impose the lower, middle or upper term sentence. When the trial court announced its intention to deny probation, the only concerns it mentioned were that Hegazy was not accepting responsibility or acknowledging culpability for the offenses. Accordingly, even if the trial court's statement was factually incorrect, it was not part of the analysis it employed in reaching its decision.

Second, Hegazy asserts the record does not support the trial court's conclusion that he lacked remorse for the offenses. More than one witness testified at trial that Hegazy apologized at the scene and said he was confused. Hegazy also apologized at the

sentencing hearing and expressed regret for what occurred due to his lack of understanding of what was going on at the incident.

These apologies, however, must be contrasted with Hegazy's previous repeated denials of wrongdoing. At trial, Hegazy denied hitting anyone with the wheel chock. In his interview with the probation officer, Hegazy again denied hitting anyone with the wheel chock, claiming that the whole case was a "conspiracy between fire personnel and the police." His apology at the sentencing hearing also was conditional in the sense that it was not so much an acknowledgement that he had done anything wrong, but rather an explanation that his conduct was the result of him "not understand[ing] what was going on that day." Based on this record, the trial court's doubts regarding the sincerity of Hegazy's remorse was justified.

Third, Hegazy takes issue with the trial court's comments that he told the probation officer a story that was different to what he testified to at trial. As he explained at the sentencing hearing, Hegazy believes the translator "didn't translate properly to the probation people."

Whether or not there was a problem with the translation provided during his probation interview (and there is nothing in the record which would support this claim), the trial court obviously was not convinced by Hegazy's explanations. This does not mean the trial court acted in an arbitrary or capricious manner. The trial court had the benefit of hearing all the testimony presented at trial, including Hegazy's testimony. It reviewed the probation officer's report. At the sentencing hearing, after expressing its doubts that Hegazy had the proper "mind set" to succeed on probation, Hegazy had an opportunity to persuade the trial court that he would in fact do well on probation. The trial court was not convinced. Furthermore, both at trial and in his probation interview, Hegazy denied committing the crimes of which he was convicted, which included three violent felonies, and claimed the incident arose out of some conspiracy between firefighters and police.

14

Finally, Hegazy contends the trial court failed to take into account his psychotic illness.  Prior to trial, Hegazy was evaluated by a psychiatrist because there was a doubt about his competency pursuant to section 1368.  Though found competent to stand trial, the psychiatrist opined that Hegazy had "an acute psychotic episode" on February 24, 2012, and "misinterpreted what was transpiring at that time."

California Rules of Court, rules 4.413(c)(2)(A) permits a court to consider in mitigation the fact that a defendant "participated in the crime under circumstances of great provocation, coercion, or duress not amounting to a defense."  Rule 4.413(c)(2)(B) provides when the "crime was committed because of a mental condition . . . and there is a high likelihood that the defendant would respond favorably to mental health care," a sentencing court can consider this as a mitigating factor.  However, the sentencing factors described in rule 4.413 are "not to be read expansively."  (*People v. Superior Court* (*Dorsey*) (1996) 50 Cal.App.4th 1216, 1227.)

While there is some evidence in the record to show Hegazy may have some degree of mental illness, Hegazy does not show his crimes were committed as a consequence of this mental illness.  In fact, Hegazy persisted in denying that he committed *any* crimes that night.  The trial court did not abuse its discretion in denying probation.

## III. DISPOSITION

The judgment is affirmed.

_____
Premo, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Márquez, J.