Filed 9/7/16  P. v. Faulkner CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>TODD MICHAEL FAULKNER,<br><br>    Defendant and Appellant. | F070977<br><br>(Fresno Super. Ct. No. F13910611)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Alvin M. Harrell III, Judge.

Robert F. Kane, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and George M. Hendrickson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P.J., Gomes, J. and Franson, J.

Defendant Todd Michael Faulkner was convicted by no contest plea of being a felon in possession of an assault rifle (Pen. Code, § 29800, subd. (a)(1)).[1] On appeal, he contends the trial court abused its discretion when it imposed a midterm sentence of two years in prison, rather than a mitigated sentence of 16 months or a grant of probation. We affirm.

## FACTS[2] AND PROCEDURAL HISTORY

On November 7, 2013, deputies responded to defendant's Squaw Valley residence regarding a disturbance. They found an injured dog and a trail of blood near the entrance of the residence. After getting no response, they entered the residence to investigate. As they walked through the residence, they smelled marijuana, observed two bedrooms being used to grow and process marijuana, and saw evidence of marijuana honey oil extraction. After obtaining a search warrant, the deputies discovered a large container of honey oil, equipment for honey oil extraction, 47 marijuana plants hung to dry, 13 mature marijuana plants, and 33 young marijuana plants. In the master bedroom, they found an AR-15 chambered rifle with one round in the chamber but no magazine attached, several boxes of .223 Remington ammunition containing 80 rounds, and two AR-15 magazines.

Defendant and his girlfriend arrived home and learned that the deputies had found the marijuana. Defendant told the deputies he had a Marijuana Recommendation Card. The deputies explained that the card did not allow him to extract the honey oil. (Used equipment suggested defendant had produced hundreds of doses of honey oil.) Defendant admitted that everything inside the residence belonged to him, including the rifle. He explained he had found the rifle at a marijuana growing site.

On November 5, 2014, defendant pled no contest to being a felon in possession of an assault rifle (§ 29800, subd. (a)(1)). The trial court indicated a sentence lid of

---

**1** All statutory references are to the Penal Code unless otherwise noted.

**2** The facts of the offenses are taken from the probation officer's report.

three years in exchange for dismissal of two other felony counts, unlawful possession of ammunition (§ 30305, subd. (a)(1)) and manufacturing phencyclidine (Health & Saf. Code, § 11379.6, subd. (a)).

The probation officer's report noted that defendant's health was poor: He had a tumor removed in 2011 and suffered from serious migraines and a bad memory. He also suffered from anxiety and took Xanax to treat it. He said he used marijuana twice daily, but denied using any other drugs, including alcohol. He used marijuana for medical purposes because it helped his pain and also helped him eat and sleep. The report noted that defendant was engaged and had a 12-year-old child. Defendant did not submit a written statement to the probation officer.

The probation officer stated that defendant was statutorily ineligible for probation in the absence of unusual circumstances, and the officer could find none. As for a prison commitment, the probation officer analyzed circumstances in aggravation and mitigation, finding the following factors. In aggravation: (1) the manner in which the crime was carried out indicated planning, sophistication or professionalism; (2) the crime involved a large quantity of contraband; (3) defendant's prior convictions were numerous or of increasing seriousness; (4) defendant's prior performance on probation or parole was unsatisfactory; and (5) the dismissed counts listed in the complaint could be considered as factors in aggravation. In mitigation: (1) defendant voluntarily acknowledged wrongdoing before arrest or at an early stage of the criminal process. The probation officer recommended the middle term of two years in prison.

Defendant had been convicted of misdemeanor driving without a license in 2000 and 2003, felony possession of marijuana in 2003, felony growing of marijuana in 2006, and misdemeanor driving under the influence of alcohol in 2009. He had been granted probation.

On January 28, 2015, the sentencing hearing was held. The court stated it had read and considered the probation officer's report and asked if there were any changes,

corrections, deletions, or additions to be made.  Defense counsel said no, then stated the following:

> "[DEFENSE COUNSEL]:  Your Honor, [defendant] is asking the Court for leniency, asking the Court either find unusual circumstances to place him on probation or sentence him to the mitigated term of 16 months.  [Defendant] suffers from brain tumors and has significant pain that he has been dealing with as well as surgeries.  He is the sole provider for his 12-year-old son, his 18-year-old son who still lives with him and his two-year-old son.  He has two prior felony convictions, but he successfully completed both of those.  He admitted responsibility at an early stage of the proceedings, was cooperative with officers, and this is not a crime of violence.  [Defendant] would also like to address the Court."

Defendant then explained to the court that the deputies did not find the rifle during their search of his residence.  Rather, he approached them and told them he had a felony and did not want the rifle on his property.  He told them he found the rifle in the woods in a Mexican cartel grove and took it because somebody could have shot a child or someone else.  He slashed the water lines and took the rifle and ammunition.  He possessed the rifle for two weeks and was afraid to give it to the police because he did not want to go to prison for it.  He knew he was not supposed to have it.  When he handed it to the deputies, the rifle was broken and inoperable.  He said the photograph of the rifle assembled did not show the rifle as it was when he gave it to the deputies.  He turned the rifle over willingly and could simply have remained silent about it.

The court said the investigator's report stated that defendant bought three rounds of ammunition for the rifle from a friend.  The court asked defendant why he would buy ammunition if the rifle did not work.  Defendant said the report was not true.  He found ammunition with the rifle and took everything to protect others.  He did not know that the rifle worked.

The court gave counsel an opportunity to present argument.  The following occurred:

4.

"[PROSECUTOR]:  Your Honor, what [defendant] told you is that he single-handedly walked into a marijuana grove and took weapons away from a Mexican drug cartel.  I don't know how believable that is, but he says he took a—an automatic weapon and boxes of ammunition from a Mexican drug cartel.  That's what we're starting with.  Second thing I'd like to argue, is that [defendant is] before the Court with two felony convictions, and this would be his third.  So, the Court would have to find unusual circumstances not to send him to prison.  The third thing I would like to argue is that when—  [¶] … [¶]  When the Court saw the weapon and saw the boxes of ammunition, the Court could see that the—the weapons here are very clean.  The boxes are very clean as if they were bought from a store, your Honor.  It's not as if they were found lying somewhere in the dirt, and then we're talking about a dirty weapon in rusted condition that would have been left out by somebody, left out in the open as if it was rusted and a child would find it.  Third, the weapon was found in a place—was found behind his dresser in a place where it could be hidden.  It wasn't as if it was a weapon that he just found somewhere and just left it for him to bring to law enforcement on a different day.  He had it—he had it behind a dresser, and one of the pictures shows the weapon as it was found behind the dresser.  If the Court sees the picture on the lower bottom side—lower bottom right-hand side, this is a picture of the weapon as it was found behind the dresser.

"THE COURT:  Let me see it.  Looks like it's all put together to me.

"[PROSECUTOR]:  Yes.

"THE COURT:  I'm going to return that, and I'm also taking the opportunity to look at the boxes of ammunition.  Court's very familiar with this type of ammunition.  Those boxes do look like they're in very good condition.  They do not look like boxes that are left out to the elements, and I'm looking at the firearm, although it is painted camouflage green and black, it does not appear to have any dirt or any type of leaves or anything that would be consistent with it being left in a forest even for a short period of time.  So, I'm going to return that back to you, Counsel.

"[PROSECUTOR]:  Now, the offer I gave [defendant], I thought, was generous, because if the Court were to look at Count Three, which I dismissed as part of the plea, his exposure was seven years in prison.  Now, I think realistically he wasn't going to do seven years, but I do think realistically he could have done five, because it's a three, five and seven [offense].  Now, we combine that with the fact that he's possessing a weapon, that would be five years, not in local jail, but it would be five years in prison.  So, I gave [defendant] the benefit of the doubt by—by offering

5.

the 16, two, three—16, two, three offense, and I wanted to argue the three [years], and I'm still arguing the three. And the reason I'm arguing the three is we're talking about a man who has two prior marijuana offenses, one from 2007, possession for sale of marijuana in '03 and another Health and Safety Code [section] 11358 in '06 for another cultivation charge. Now we have [defendant] coming before you when the officers come into his house and find two large glasses filled with marijuana honey oil, 33 plants hanging from the ceiling to dry, another—that would be in the central bedroom, in the west central bedroom, 14 marijuana plants hung from the ceiling, 13 plants in a plastic box, 33 plants in red cups in the master bedroom. He has the rifles, he has the ammunition, and he has two large glasses filled with marijuana honey oil. This is a person with priors. He has another prior—he has another case before you with the same offense, and he told you he stole. In his—in his statement to you before— to the Court right now, he told you he stole ammunition that—the same ammunition that was found in the house. So, we have a person with two priors, he's doing the same thing again. He's telling you he steals, and—and his—and he has a weapon in his house. And now we're talking about not sending him to prison. Well, I'm arguing for prison notwithstanding the Court's indicated, and that is why.

"THE COURT: Thank you. Very eloquently put. [¶] [Defense Counsel], do you wish to be heard?

"[DEFENSE COUNSEL]: I believe [defendant] would like to address some of the things that were stated.

"THE COURT: Yes.

"THE DEFENDANT: Sir, my first marijuana charge was possession, but I had a medical license, and Fresno County did not abide by my medical license and gave me a felony anyway. In Count Two of my medical charge, cultivation, I had a medical license, and they did not acknowledge it. They took me to jail, and this—what's going on now is, yes, I did take the guns from the woods. They were in a big green military bag. There was a water line. There was food. I stabbed all the water line[s] so they couldn't grow their pot up in the mountains. I took the gun. I took all the ammunition, because I did not want some kid to shoot their dad. My dad was working on trying to turn this gun in for me. I had it in my possession for two weeks. My dad was still trying to work on turning this in. I asked my girlfriend, 'How do I go about doing this, because I'm scared. I'm a felon.' But I did not, in other words, want these weapons in the woods where kids go with their parents. So, I took them, and I'm not going to lie to nobody, and I did not lie from the beginning. I told the

6.

officers this that arrested me. I have nothing to hide about this. I'm telling the complete truth. When I got arrested for my first charge for marijuana, I was not considered a marijuana person to use [Proposition] 215, which I had my 215 card, which was a compassionate caregiver's card. They still threw me under the wheels, gave me felony probation, two years this and that, a lid. I did good. I stopped smoking pot for two years, and I started to use it again because of my tumors. Well, I grew 10 plants. I'm allowed 99, so I grew 10. They busted me for cultivation because Fresno County did not acknowledge the medical marijuana laws. They still don't.

"And yes, I'm going to be honest with you, sir, I'm not going to lie to you, because I show nothing but compassion for this Court. I don't want somebody to be killed in the mountains where I'm at because some Mexican cartel left the stockade of weapons and food and stuff for their growers. I'm going to sabotage it. I'm not going to allow that in the mountains where I live. I pulled over to take a leak. I seen the stuff in the bushes, and that's when I took action. Now, I know I did wrong, and I'm not going to sit here and tell you that I'm not a wrong person. I told you I was guilty. I didn't just say no contest. I said, 'I am guilty of taking this gun,' but after the police had searched my house for six hours from 4:00 o'clock in the morning until 11:00 o'clock when I got there in the day, seen my dog dead, you know, I had nothing to say. I didn't want to talk to the cops. They had already been doing their searching. I did not have 15 pounds of marijuana. I didn't have 15-pound plants growing. I didn't have anything but one plant hanging, and that was my last hand. I had already harvested and gotten all my marijuana out of my house so my kids didn't have to be around it. I got the gun. It was stashed behind my dresser, and I left it there because it was broken, and I kept trying to tell my dad, 'Hey, I need to get rid of this thing. Hey, I need to get rid of this thing.' I asked my girlfriend, 'How do I get rid of this gun? I'm a felon. I'm scared.' I was scared. I'm still scared, but this is what's going on. So, this is where I'm at today. I want to take care of this matter. Whatever I have to do, I will do, because I'm tired of coming back and forth to court and trying to figure out what to do on something that I thought was right. I don't think the Mexican cartel should be up there growing. So, if I find something of theirs, I'm going to take it, I'm going to slash it. I'm going to—I'm going to destroy it. Still to this day, if I get out of jail, out of prison, and I see it again, I'm going to do it again, because there's a lot of kids that go to these places. It's a big waterfall. They go with their family, and they see the waterfall. Well, they don't know that the Mexican cartel grows below. I do. I happen to take a leak, see a big ol' green bag, went down there, opened it up, looked in it, and there was the machine gun, the AR15, and it was fully camouflaged. It had one camouflage clip in it and

two black clips with it. It had four rounds of—four boxes of ammunition. I believe one or two boxes of .45 shells and a two—and a [.]30-30—box of [.]30-30 shells. So, I know that those cartel members still have guns out there in the field. I told the officers I'll take them right to it right now because it was still there. You know, I have nothing to hide. I have no reason to hide nothing. I'm not lying about anything. I just want to take care of my life and get it straightened out so I can go on with my life. I was in the military, sir. I took a foreign oath—foreign, domestic, anything, if somebody bad does something, I'm going to take care of it, regardless. I don't know what to say. I—I honestly don't know what to say. I took the firearm because I didn't want a child to get killed. I did not know it was real. I didn't know it didn't work. So, obviously, these Mexican cartels are sending these broken guns up there so they can overtake their crops with no problems. I have nothing to say about that. I'm guilty about the gun. I took the gun, yes, I did. I possessed the firearm behind my dresser, no clip in it, no pins in it, no way to fire it. And I stuck it behind my desk—or behind my dresser folded in half, not that same picture [the prosecutor] is showing me. Nothing was together. She seen it with her own eyes, and I asked her, 'What should I do with this thing?' And she didn't even know, so I'm—I was just scared. I did not know what to do with this gun except for, okay, these guys came to my house, you know, they're searching because my neighbor called the cops because of a fight. My dog was killed. I'm not running from my problems. I went to the house to talk to the police officers. The police officers talked to me. I said, 'How you guys doing? What's going on?' 'Oh, you need to tell us what's going on. What's all this wax?' I said, 'There isn't a lot of wax.' I had two dishes of seven grams of medical marijuana oil that I used for two months. That's enough for me to use for two months because I can't smoke marijuana. I eat it. I get that wax, and I make cookies with it, and that's the God honest truth. I'm not trying to sit here, snowball the Court. I just want to get my life straightened out and go live my life, regular person. That's why I'm here today telling you my story. I have no reason to lie to you. You can ask the cops, because I told them the same thing. I had no reason to lie to them.

"[PROSECUTOR]: The People have no response.

"THE DEFENDANT: I mean, I could have told the police myself, 'Hey, I don't have nothing,' and they would have never found anything, and I could still have this gun in my house, but I don't lie. I told the police that I have an AR15, broken, and I have the clips and the ammo and several kinds of ammo for it that I had found in a cartel crop, if I could please turn it in without any problems. [¶] … [¶] They told me, 'Yes, that's fine.'

8.

They were going to cite me out, send me home for the honey butane oil, but instead, I got arrested, put in jail, you know. I need medication every day. I didn't get medication for a whole week. I sat in that jail dying, migraine pain. I'm not trying to run from you. I'm not trying to run from anybody here. I'm totally being honest, and I'm telling you right now, I am guilty of taking the rifle from an area where children are, and I have nothing further to say, except for that I might have saved somebody's life because, honestly, sir, I could have told the cops I don't have nothing, but I don't lie. I told them what I had, and I gave it to them.

"THE COURT: Matter submitted?

"[PROSECUTOR]: Yes.

"[DEFENSE COUNSEL]: Submitted.

"THE COURT: Pursuant to Penal Code Section 1203(e)(4), [defendant], you are statutorily ineligible for probation except in cases of unusual circumstances where the interest of justice would be best served if you were granted probation. The explanation you provide to the Court regarding your possession of the AR15 along with the ammunition and the—

"THE DEFENDANT: I had [.]270 rounds and .45 rounds.

"THE COURT: Now, are you saying that there were not 33 plants hanging from your—

"THE DEFENDANT: No.

"THE COURT: —ceiling?

"THE DEFENDANT: No. There was one plant, sir.

"THE COURT: Because they have it documented very well, 33 marijuana plants hanging from your ceiling to dry in the central bedroom, 14 marijuana plants hung from the ceiling in the west central bedroom, 13 mature marijuana plants in plastic pots, 33 young marijuana plants in red pots, then in the master bedroom is where they found the AR15 with one round in the chamber, no magazine attached, several boxes of [.]223 ammunition—

"THE DEFENDANT: Yeah.

"THE COURT: —the two AR15 magazines and then also the honey oil and so forth and so on. [¶] … [¶]

"THE COURT: All right. [defendant], I'm going to tell you, sir, that it's very commendable for you to retrieve the firearm with the intent to turn it in or destroy it and hopefully saving someone from hurting themselves or someone else, but the bottom line is that should have been turned over immediately. Whether you have a third person do it on your behalf or something, it should have been turned over immediately. You knew you weren't supposed to have any firearms or any ammunition, correct?

"THE DEFENDANT: Yes, but see, I was so scared, I didn't know what to do. I was afraid I was going to go to jail right then and there if I even called the local Sheriffs. They're so—they're so corrupt up there. They take people to jail for little things.

"THE COURT: It's not getting any better for you, [defendant].

"THE DEFENDANT: No, I'm just telling the honest truth, sir.

"THE COURT: All right. Well, at this time, the Court does not find unusual circumstances to grant probation. The Court had listened to your version earlier and had [given] an indicated after hearing that of a stayed prison term of three years. After listening to the prosecutor … and hearing his eloquent recitation of the facts, the Court does believe that a prison term is appropriate. Therefore, the Court is going to deny probation, and the Court is as to Count One, a violation of Penal Code Section 29800(a)(1), will select the mid-term of two years for the violation. You'll receive time credits of nine actual, eight good time/work time for a total of 17. You'll be committed to the California Department of Corrections and Rehabilitation. Pursuant to Penal Code Section 1202.4, you will be ordered to pay a restitution fine of $600, pursuant to Penal Code Section 1202.45, an additional restitution fine of [$]600 if a period of parole is ordered and will be suspended unless parole is revoked. Pursuant to Penal Code Section 296, you're ordered to provide buccal swab samples, a right thumb print, a full palm print impression of each hand, any blood specimens or other biological samples for law enforcement analysis. You will be included in the State of California's DNA forensic identification database and data bank program. This order is to be included in the abstract of judgment. You're to pay a courtroom security fee of [$]40, $30 assessment fee, probation report fee of [$]296. I'm going to suspend those fines because I do not believe you have the means to pay.

10.

"[Defendant], I'm going to let you know, in the analysis—because we were having two complete[ly] different stories, your story and then what we have from the prosecution and what was set forth in the probation report, and a couple things did you in. That picture that I saw of the AR15, that is fully assembled. I know about AR15s. I'm very familiar with those firearms.

"THE DEFENDANT: Sir—

"THE COURT: Stop, stop.

"THE DEFENDANT: —that was totally taken apart.

"THE COURT: When I saw the photographs where it's taken in the back behind your dresser, that's fully assembled. I can't see if the clip is in there, but the statement says the clip was taken out, and there was a round inside the gun. I find it hard to believe that law enforcement's going to put the gun back together, put it behind the dresser then take a picture.

"THE DEFENDANT: Sir, the rifle is held together by a pin. Okay. That holds the rifle straight. Okay.

"THE COURT: I understand that.

"THE DEFENDANT: That pin was gone. So, I handed that gun to those cops folded. They put something in there to keep it from—from folding.

"THE COURT: From what I can see on that picture, the upper is fully attached to the lower, and it's crystal clear, and you indicated that that is not how that gun was.

"THE DEFENDANT: It's not how that gun was, sir.

"THE COURT: Well, there's a picture that refutes that. And then you indicated that you got some of the ammunition—well, all the ammunition from the field, but however, it's stated in a report here from law enforcement that you indicated that you purchased, it says, three rounds of ammunition from one of your friends, AR15 ammunition, which would be either 5.56 or the [.]223, and if—if someone was going to return the gun, I can't imagine why they would purchase ammunition for the gun from their friend.

"THE DEFENDANT: Well, I don't understand why I would purchase ammunition when I just found three boxes with the gun.

11.

"THE COURT:  I don't know why you'd do that either, sir.

"THE DEFENDANT:  So, why is that on there?  I don't—that's a lie.

"THE COURT:  I don't know why you'd do that either, but in any event, that's the Court's ruling."

## DISCUSSION

Defendant contends the trial court abused its discretion when it sentenced him to two years in prison and failed to state its reasons for the sentence.  He argues the court failed to consider all of the mitigating factors, including his 2011 surgery to remove a brain tumor, his pain and anxiety, his use of medications, his 12-year-old child, his prison-free history, his "serendipitous" discovery of the rifle, his fear of turning the rifle over to authorities, his use of marijuana for personal medical purposes, and the fact that probation may have been considered in his case.  He argues that even if there were no unusual circumstances to support a grant of probation, the two-year term was an abuse of discretion.

### I.    *Decision Not to Grant Probation*

 "Probation is not a matter of right but an act of clemency, the granting and revocation of which are entirely within the sound discretion of the trial court."  (*People v. Pinon* (1973) 35 Cal.App.3d 120, 123.)  California Rules of Court, rule 4.414 sets out some of the criteria the trial court may consider in exercising its discretion.[3]  But the trial court is not limited to those factors, and it may consider others not enumerated in the rules so long as the court states any additional criteria on the record.  (Rule 4.408(a).) The criteria enumerated in the rules will be deemed to have been considered by the trial court "unless the record affirmatively reflects otherwise."  (Rule 4.409.)  "Under some circumstances, the court may grant probation only in 'unusual cases where the interests of justice would best be served' according to established criteria.  (§ 1203, subd. (e);

---

[3]    All references to rules are to the California Rules of Court.

[citation].)" (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.) "A defendant who is denied probation bears a heavy burden to show the trial court has abused its discretion. [Citations.] Furthermore, 'a denial of probation after consideration of the application on its merits is almost invariably upheld.' " (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1157.)

## II. *Decision Not to Select Lower Term*

A trial court's exercise of its discretion in selecting a lower, middle, or upper term sentence under section 1170.1 is also reviewed for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) To determine the appropriate sentence, the trial court weighs the factors in aggravation, found in rule 4.421, against those in mitigation, found in rule 4.423. (See Rule 4.420(b) [trial court may consider circumstances in aggravation and mitigation "and any other factor reasonably related to the sentencing decision"].) The relevant rules also permit the trial court to consider factors not specifically enumerated in rules 4.421 and 4.423. (Rules 4.408, 4.420(b).) A single factor may be determinative in the sentencing decision. (*People v. Black* (2007) 41 Cal.4th 799, 813 ["Under California's determinate sentencing system, the existence of a single aggravating circumstance is legally sufficient to make the defendant eligible for the upper term"; *People v. Forster* (1994) 29 Cal.App.4th 1746, 1758 [single factor is sufficient to justify the court's sentencing choice].)

"Sentencing courts have wide discretion in weighing aggravating and mitigating factors. [Citation.] Indeed, a trial court may 'minimize or even entirely disregard mitigating factors without stating its reasons.' " (*People v. Lai* (2006) 138 Cal.App.4th 1227, 1258.) The court is not required to review in detail each of the mitigating factors upon which the defendant relies. Indeed, a court can reject all mitigating factors without explanation. (See *People v. Avalos* (1996) 47 Cal.App.4th 1569, 1583 [court need not explain its reasons for rejecting mitigating factors].) " 'Further, unless the record affirmatively indicates otherwise, the trial court is deemed to have considered all relevant

criteria, including any mitigating factors.' " (*People v. King* (2010) 183 Cal.App.4th 1281, 1322, fn. omitted.)

### III.    *Analysis*

As a reviewing court, we may not reweigh the sentencing factors or substitute our judgment for that of the trial court. (*People v. Scott* (1994) 9 Cal.4th 331, 355.) Instead, we limit our review to a single issue—"whether the sentencing court abused its statutory discretion." (*People v. Jordan* (1986) 42 Cal.3d 308, 317.) In the absence of a showing by defendant that the trial court's sentencing decision was irrational or arbitrary, we must presume the trial court acted to achieve legitimate sentencing objectives, and its discretionary determination will not be set aside on review. (*People v. Superior Court* (*Alvarez*)*, supra,* 14 Cal.4th at pp. 977-978.) We may not reverse the court's decision merely because reasonable people might disagree with it. (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

At the outset, we reject defendant's suggestion that the trial court failed to consider his health problems, his need for medication and medical marijuana, and the circumstances of his discovery of the rifle and ammunition. These circumstances were identified in the probation officer's report, which the court stated it had read and considered. Furthermore, at the sentencing hearing, defense counsel and defendant expounded at length on defendant's medical issues, his need for medical marijuana, the circumstances of the rifle discovery, and the reasons he was afraid to hand the rifle over to law enforcement. The court was not required to discuss each factor before it, and we presume it properly considered each factor.

The court told defendant it was commendable to retrieve the rifle to protect others, but he was required to turn the rifle over to authorities immediately. Defendant admitted knowing he was not supposed to have the rifle, but said he was afraid of going to jail. The court said it did not believe defendant's explanation about his possession of the rifle and the ammunition. The deputies' photograph showed the rifle fully assembled and

14.

hidden behind the dresser, and the court did not believe the deputies had assembled the rifle and staged the photograph. Furthermore, the court did not believe defendant's story of finding the ammunition in the woods because defendant said he bought three rounds from a friend, which he would not have done if he had found three boxes of ammunition or if he had intended to turn the rifle over to authorities. The prosecutor pointed out that the rifle and the boxes of ammunition appeared to be very clean, as if bought from a store, rather than found out in the elements. The court looked at the photographs and agreed that nothing looked as though it had been left out in a forest for even a short time. The prosecutor stressed that defendant had an automatic weapon, boxes of ammunition, and large vessels of honey oil. Plus, he had priors.

Thus, the problem for defendant was not that the court did not consider all of the factors; the problem was simply that the court did not believe defendant's story. In other words, the court rejected defendant's explanations as factors in mitigation. The court determined that defendant purposely kept an assembled, operable, and loaded rifle, plus boxes of ammunition, hidden behind the dresser in the master bedroom of his house where he was growing marijuana and producing large amounts of honey oil, and that he did not intend to surrender the rifle to authorities. We are in no position to question the trial court's credibility determinations or reweigh the sentencing factors. The court's decision that under all the circumstances of this case, defendant's purposeful possession of a hidden, loaded rifle was a crime warranting the middle term was neither irrational nor arbitrary, even if defendant was suffering from health issues. We see no abuse of discretion.

## DISPOSITION

The judgment is affirmed.

15.